## BLUM MILLING CO. v. MOORE-SEAVER GRAIN CO. (No. 704-4264.) *

(Commission of Appeals of Texas, Section A. Oct. 28, 1925.)

1. Action ⊜⟞50(1)—General policy of law to permit all controversies relating to one subject-matter, and as affecting all interested persons, to be settled in one suit.

The general policy of the law is to permit all controversies of legal or equitable cognizance relating to one subject-matter, and as affecting all interested persons, to be settled in one suit where this can be done without undue prejudice to rights of any of the parties, which policy allows joinder as to matters ex contractu and ex delicto if they arise out of or relate to the same transaction, and if in their main aspects the same evidence will solve questions of liability as to each or both.

2. Parties ⊜⟞25—Carriers held proper parties in suit by buyer to recover purchase price of grain because not up to quality ordered.

In buyer's suit to recover purchase price of grain because not up to quality ordered, carriers which transported it *held* proper parties, under Rev. St. 1911, art. 1906, subd. 6, where buyer had no means of fixing identity of active wrongdoer, or of allocating liability, and prima facie buyer was injured by wrong of seller, carriers, or both.

3. Sales ⊜⟞397—Evidence showing condition of grain purchased by buyer when car was opened at destination held relevant.

In buyer's action to recover purchase price of grain because not up to quality ordered, with buyer being prima facie injured by wrong of seller, or carriers which transported grain, or both, evidence showing condition of grain when car was opened at destination was relevant without regard to terminology of sale contract.

4. Trial ⊜⟞255(4)—Evidence competent for one purpose held admissible for all purposes, where no request made that it be limited to issue for which admitted.

In buyer's action to recover purchase price of grain because not up to quality ordered, with buyer being prima facie injured by wrong of seller, or carriers which transported grain, or both, evidence showing condition of grain when car was opened at destination, being competent on issue of carriers' liability, was admissible for all purposes, where there was no request that effect of such evidence should be limited to issue of carriers' liability.

⊜⟞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Rehearing denied December 10, 1925.

**5. Trial ⟨key⟩48—Testimony, admissible in respect to any existing issue, not excluded because not admissible on all issues.**

If proper testimony is admissible in respect to any existent issue, it cannot rightly be excluded because it is not admissible on all issues.

**6. Trial ⟨key⟩255(4)—Trial court not required on its own motion to restrict consideration of testimony to a particular relevant issue.**

Trial court is not required on its own motion to restrict consideration of testimony to a particular relevant issue; it being duty of objecting party at time of admission, or later, by a special charge or motion, to request its limitation.

**7. Appeal and error. ⟨key⟩216(1)—Failure of trial court to restrict consideration of testimony to relevant issue not reviewable, unless objecting party requests its limitation.**

To secure review of trial court's failure to restrict consideration of testimony to a particular relevant issue on appeal, objecting party must, at time of admission, or later, by special charge or motion, request its limitation.

**8. Appeal and error ⟨key⟩1003—Appellate court does not substitute its own judgment for that of jury on weight of evidence.**

It is for jury to weigh evidence, and not function of appellate court to substitute its own judgment therefor.

**9. Sales ⟨key⟩181(5)—Testimony and certificate of official grain grader held admissible on issue whether grain in bad condition when shipped.**

In buyer's action to recover purchase price of grain because not up to quality ordered, with provision that Kansas City official grades existing at time of delivery should be conclusive between the parties, testimony and certificate of official grain grader in Kansas City *held* admissible on issue of whether grain was in bad condition when shipped.

**10. Appeal and error ⟨key⟩995—Evidence ⟨key⟩588 —Neither jury nor appellate court can ignore physical conditions by which a witness is circumstanced.**

Neither a jury nor an appellate court on a proper review may rightly ignore physical conditions by which a witness is circumstanced, or the maxima potentialities of his vision.

**11. Evidence ⟨key⟩383(3)—Certificate of official grader as to quality of grain held not conclusive.**

Under contract for sale of grain shipped in interstate commerce providing that "all sales of grain are of Kansas City official grades existing at time of delivery which shall be conclusive between the parties hereto," parties *held* not bound by grade as established by official grain grader of Kansas City, where no authority was delegated to him directly or indirectly in the contract, and test made was not such as came within the intent of the parties, and certificate of Western Weighing and Inspection Bureau, under United States Grain Standards Act (U. S. Comp. St. §§ 8747½–8747½k), describing grain as "bulk wheat" being more readily credited.

Error to Court of Civil Appeals of Tenth Supreme Judicial District.

Suit by the Blum Milling Company against the Moore–Seaver Grain Company. Judgment for plaintiff in the district court was reversed, and remanded in part and affirmed in part, in Court of Civil Appeals (264 S. W. 551), and plaintiff brings error. Judgment of Court of Civil Appeals reversed, and judgment of district court affirmed.

Morrow & Stollenwerck, of Hillsboro, for plaintiff in error.

Morrison, Nugent, Wylder & Berger, of Kansas City, Mo., and Wear, Wood & Wear, of Hillsboro, for defendant in error.

Lee, Lomax & Wren, of Fort Worth, Terry, Cavin & Mills, of Galveston, and Collins, Dupree & Crenshaw, of Hillsboro, for Atchison, T. & S. F. Ry. Co.

### Statement of the Case.

NICKELS, J. April 7, 1922, Blum Milling Company, a corporation, through its agent Martin, ordered a carload of 1,000 bushels of No. 2 red wheat, suitable for milling, from Moore–Seaver Grain Company, through its agent at Fort Worth, which order was then and there accepted; the price being $1.52½ per bushel. This agreement was made in *telephone conversations.* The same day it was (by the Fort Worth agent) communicated to the grain company at Kansas City, and on the same day, also, the grain company, at Kansas City, prepared and mailed to the milling company a written (and printed) "confirmation." The milling company received and "accepted" the "confirmation" and returned it by mail to the grain company. The instrument is fully described in the opinions of the Court of Civil Appeals, 264 S. W. 551. With the paper as mailed to the milling company was a letter which acknowledged the sale of 1,000 bushels of red wheat at the price named, and which stated the paper "confirmed" that sale. The relevant portions of the "confirmation" are further stated in the opinion here.

Under the arrangements, 1,000 bushels of wheat were shipped from Kansas City to the milling company at Blum, covered by shipper's order bill of lading. The bill of lading received by the grain company was by it attached to a sight draft upon the milling company and forwarded to Blum for collection of the draft and delivery of the lading. These papers reached Blum, were presented to and the draft paid there by the milling company some days before the carload of wheat arrived on April 18, 1922. When the car was opened, and during process of unloading, the grain (according to the testimony of the milling company's witnesses) was found to be musty, dusty, etc., other than "No. 2 red wheat," and unfit for mill-

⟨key⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

ing or other purposes except "chicken" or "hog" food. Thereupon notice was promptly given the grain company and demand made that it take back the grain and return the $1,525.00 paid on the draft. These demands being refused, this suit was begun (August 3, 1922) against the grain company to recover the purchase price thus paid. The grain company answered, and thereupon the milling company filed an amended petition making the carriers (Atchison, Topeka & Santa Fé Railway Company and Gulf Colorado & Santa Fé Railway Company) parties defendant, it being alleged, in the alternative, that the wheat was not No. 2 red wheat and was unfit for use and was without value when delivered by the carriers at Blum, and that, if it was No. 2 red wheat and in good condition when delivered to the carriers at Kansas City, it had been damaged en route through their negligence, etc., recovery of damages against them was thereupon prayed; recovery against the grain company being sought' as originally. The grain company answered generally, alleged that, in fact, the grain delivered to the carriers was No. 2 red wheat in good sound condition; denied that it was in the condition claimed on arrival at Blum, and specially pleaded the terms of the "confirmation" paper referred to in the opinion and "grading" under it as conclusive of the kind and quality of the wheat, etc. The carriers answered generally, and specially pleaded that if the grain was not in good condition at Blum it was not in good condition at Kansas City, etc., and that its injury, if any, was due to its inherent nature and tendency to heat.

The general demurrer of the grain company was overruled, the testimony mentioned (as showing the condition of the wheat at Blum) was admitted over the grain company's objection, peremptory instruction in that company's favor was refused, and the case was submitted to the jury on 24 special issues. Amongst the findings of the jury are these: The wheat, when delivered to the carriers at Kansas City, was not No. 2 red wheat, nor was it in good condition. It was not No. 2 red wheat and was not in good condition when delivered by the carriers at Blum. The wheat had not suffered change en route, and it was not No. 2 red wheat according to Kansas city official grades when given to the carriers at Kansas City. The difference between the value of No. 2 red wheat in good condition and that actually delivered was $1 per bushel. Thereupon judgment was entered for $1,000 in favor of the milling company and against the grain company, and for the railway companies as against the milling company. The judgment, etc., in favor of the carriers is not challenged. Appeal was prosecuted by the grain company, and thereon the Court of Civil Appeals reversed the judgment (264 S.

W. 551), on the grounds that the testimony tending to show the condition of the wheat on arrival at Blum was incompetent and inadmissible because its effect would be to vary or contradict the terms of the "confirmation," and that the "inspection" made at Kansas City by one Swearenger, "official inspector," was conclusive against the milling company in the absence of allegations of fraud or gross mistake therein. The "inspector's" "certificate" is reproduced at length in the opinion of the Court of Civil Appeals on rehearing. 264 S. W. 551.

### Opinion.

Moore-Seaver Grain Company presented 96 assignments of error and in their support advanced 159 propositions. Blum Milling Company countered with an appropriate number. It is manifest that the propositions urged may not be separately discussed. We have examined the record, in respect to all contentions, and, as a result, we have concluded that the disposition of the case is rightly determinable by the issues of joinder and of the competency of the evidence as to condition of the wheat when it arrived at Blum. If that testimony was properly admitted, the record exhibits sufficient evidence to uphold the findings that the wheat was not No. 2 red wheat and was not in sound condition either at Blum or at Kansas City. The testimony showing the condition at Blum, as well as the facts and circumstances detailed which are sufficient to show that there was no change in condition en route, is without contradiction except as it may be impeached by the "certificate" and testimony of the Kansas City inspector and that of the grain company's other witnesses relating solely to the condition at Kansas City.

[1] 1. Misjoinder of the railway companies was urged only by general demurrer. The Court of Civil Appeals held that it could not be presented in that way. We believe subdivision 6 of article 1906, R. S. 1911, relates to nonjoinder instead of misjoinder, and that there may be cases where the latter question can be raised by demurrer. Whether that could be done in this case need not be decided, because it was proper to implead the carriers. The general policy of the law is to permit all controversies, of legal or equitable cognizance, relating to one subject-matter, and as affecting all interested persons, to be settled in one suit where this can be done without undue prejudice to the rights of any of the parties. The purpose is to avoid circuity of action and sequent expense and vexation and delay of ultimate justice. That policy allows joinder in respect to matters ex contractu and ex delicto if they arise out of or relate to the same transaction, and if, in their main aspects, the same evidence will solve the questions of liability as to each or both. Adams

v. First National Bank (Tex. Civ. App.) 178 S. W. 993; Komendo v. Fruit Co., 61 Tex. Civ. App. 631, 131 S. W. 73; M., K. & T. Ry. Co. v. Maxwell (Tex. Civ. App.) 130 S. W. 722; Fidelity Co. v. Fossati, 97 Tex. 497, 80 S. W. 74.

[2] The carriers are proper parties. The large transaction involved was the purchase, sale, and delivery of the wheat. Final delivery, in any event, required transportation from Kansas City to Blum, and the railway companies, under selection of the other parties, performed that part. If the wheat, when given to the carriers at Kansas City, was sound and of the class bought, and unsound wheat or grain of a different class was by them delivered at Blum, there was apparent liability by the carrier to the buyer. If the grain delivered by the railway companies was not of the kind bought, there was prima facie liability to the buyer and against either, or both, the seller and the transportation companies. Until the car arrived at Blum, and was opened by the carrier, the buyer had no opportunity to know the nature or condition of its loading. Up to that time, the property had been in the exclusive possession and control of the seller and carriers, consequently the buyer had no means of fixing identity of the active wrongdoer or of allocating liability. Prima facie, at least, the buyer was injured by the wrong of one, or both, and it had the right to litigate with all of them in the one suit. Id.

[3] 2. Proper joinder existing on the grounds stated, the issues joined in tripartite made it proper for the milling company to show the condition, etc., of the wheat when the car was opened at Blum, and that, too, without regard for the terminology of the sale's "contract." One issue tendered by plaintiff was that the carriers damaged the wheat, if it was "No. 2 red wheat" and in good condition at Kansas City. The railways denied, and said the wheat was not in good condition at origin, if it was in bad condition at destination. Moore-Seaver averred it was "No. 2 red wheat" and in first class state at origin, and, in part, rested its defense upon that ground. This implied, of necessity, that, if the milling company received other than that kind of quality, the carriers, and not it, were responsible. The pleading of each of the parties made the condition of the grain at origin, while in transit, and at destination material. If the carriers were able to show its condition did not change while the grain was in their possession, proof of its bad condition at Blum, in that event, perforce would strongly tend to show that it was in bad condition when the carriers got it. Conversely, if Moore-Seaver Company could prove it was in good condition at origin, it would thereby demonstrate the change, if any, was not chargeable to it; and this hypothesis it pleaded. And, as stated, the milling company could make a prima facie case against one or the other, or all, of the other parties, by showing it did not get the kind of grain it bought.

[4] The evidence being competent for that purpose at least, under the record it was admissible for all purposes. This is so because the only objection made was by Moore-Seaver Grain Company; and the objection was:

"The testimony was immaterial, in that the contract provided that delivery was to be made according to certain weights and grades at Kansas City, Mo., and the defendant, Moore-Seaver Grain Company, was in no sense responsible for the condition of the wheat delivered at Blum if said wheat was contracted to be delivered at Kansas City."

There was no request, or suggestion, then or thereafter, that the effect of the testimony be limited to the issue of the carrier's liability. The suit was not on the contract alone; it was for damages for injuries caused by the railroads as well, or in the alternative. The court could not exclude testimony tending to prove an essential fact against the carriers simply because it might be regarded as trenching upon a contract provision to which they were in no sense parties. The contract referred to in the objection as made did not affect the plaintiff's right to try out liability not governed by that instrument.

[5-7] Amongst the rules of evidence recognized and enforced in our decisions is this: If proffered testimony is admissible in respect to any existent issue, it cannot rightly be excluded because it is not admissible on all issues. Houston, E. & W. Ry. Co. v. Adams, 63 Tex. 200; H. & T. C. Ry. Co. v. Wilson (Tex. Civ. App.) 50 S. W. 156; Wilson v. Avery Co. (Tex. Civ. App.) 182 S. W. 884, 886; Carlton v. Hoppe (Tex. Civ. App.) 204 S. W. 248; Bourland v. Huffhines (Tex. Civ. App.) 244 S. W. 847, 853. A rule of practice has its source in that evidentiary principle: It is no duty of the trial court, on its own motion, to restrict consideration of the testimony to a particular relevant issue (Shumard v. Johnson, 66 Tex. 70, 72, 17 S. W. 398); in that situation, the objecting party must at the time of admission, or later by special charge or motion, request its limitation. Shumard v. Johnson, supra; Walker v. Brown, Thompson & Co., 66 Tex. 556, 558, 18 S. W. 797; St. L. & S. F. Ry. Co. v. George, 85 Tex. 150, 158, 19 S. W. 1036; G., H. & S. A. Ry. Co. v. Jackson, 93 Tex. 262, 266, 54 S. W. 1023; Id. (Tex. Civ. App.) 53 S. W. 81, 83; Shelburn v. McCrocklin (Tex. Civ. App.) 42 S. W. 329, 331; Fort Worth & D. C. Ry. Co. v. Harlan (Tex. Civ. App.) 62 S. W. 971; Hartt v. Yturria Cattle Co. (Tex. Civ. App.) 210 S. W. 612, 615. And observance of the rule of practice is essential to the right of complaint on appeal. Id. If it

were true that the testimony was subject to restriction, that was not done, or requested, and the question of its admissibility for all purposes is foreclosed. The testimony, however, was admissible, and, with the other evidence, was sufficient to warrant the verdict for other reasons.

3. The stipulation pleaded, affirmatively, by Moore-Seaver Grain Company, reads as follows:

"Unless otherwise stated, all sales of grain are on Kansas City official weights and Kansas City official grades existing at the time of delivery, which shall be conclusive between the parties hereto."

This, as is easily noticeable, does not undertake to bind the parties by some person's "grading" or "inspection"; with its context, it only binds one of them to sell, and the other to buy, such wheat as measures up to "Kansas City official grades." Mere existent standards, and not a particular application of them by some person, are the things agreed upon. Just how those "grades" are to be ascertained, and just how they are to be applied (when ascertained) to the particular grain are amongst the things not included in the subject-matter of the provision.

A holding that the certificate, or testimony, of any particular inspector is also binding, with incontrovertible effect, upon the buyer, would interpolate into the writing a term which is not there in words or by necessary implication. The paper speaks of "grades" in the abstract. Such a holding would convert the mere declaration of judgment by some man into the impersonal standard about which the parties dealt, and thus substitute for the contract as made an agreement not made except as made for them by the court.

[8] The inevitable resultant is that the question of whether or not this wheat met the "Kansas City official" standards for "No. 2 red wheat in good condition" is open to proof. That was an issue of fact. On one side of it, the milling company offered proof of condition at Blum plus evidence of nonchange between Blum and Kansas City. Contra, the grain company offered the certificate and testimony of Swearenger, "inspector" at Kansas City. This presented a conflict in testimony for whose solution a jury was impaneled. It was for those triers to weigh the evidence and to believe, or disbelieve, as to them appeared just. It is not the function of an appellate court to substitute its own judgment of the weight of the evidence, any more than it would have been proper for the trial judge to have instructed the jury to believe Swearenger and disregard all disputing testimony.

[9] The record does not present a case where the parties to a contract have therein definitely selected a person, or agency, and to him (or it) delegated the authority and duty of inspection, with a provision making his estimates indisputable, such as the Court of Civil Appeals had in mind. As a matter of course, persons with contractual power may include such a provision and its res judicata effect in their agreement. That is because they have the opportunity, in advance to be satisfied as to the character and skill of the referee whom they select, and, if they care to submit finally to his judgment, it is their own affair. With full knowledge, or opportunity to have it, and in confident reliance upon his integrity and prudence, they make him their joint agent for the specific purpose. G., H. & S. A. Ry. Co. v. Henry & Dilley, 65 Tex. 685; Boettler v. Tendick, 73 Tex. 488, 11 S. W. 497, 5 L. R. A. 270; K. C., E. P. & M. Ry. Co. v. Perkins, 88 Tex. 66, 29 S. W. 1048; Kilgore v. Baptist Ed. Soc., 89 Tex. 465, 35 S. W. 145; Gorham v. Dallas, C. & S. W. Ry. Co. (Tex. Civ. App.) 106 S. W. 930; Kettler Brass Co. v. O'Neil, 57 Tex. Civ. App. 568, 122 S. W. 900; Kihlberg v. United States, 97 U. S. 398, 24 L. Ed. 1106; Martinsburg, etc., Ry. Co. v. March, 114 U. S. 549, 5 S. Ct. 1035, 29 L. Ed. 255; Frisco Lumber Co. v. Hodge, 218 F. 778, 134 C. C. A. 456; Herman H. Hettler Lumber Co. v. Olds, 221 F. 612, 137 C. C. A. 336; Guild v. Andrews, 137 F. 371, 70 C. C. A. 49; 23 R. C. L. p. 1363. And in such a case, there are well-defined principles which must be observed. One of them is this: Since the selected referee can have no power, save that given in expressed words, or by implication of equal meaning, his decision on a point not delegated is, in species, coram non judice, and therefore void. G., H. & S. A. Ry. Co. v. Henry & Dilley, supra; K. C., E. P. & M. Ry. Co. v. Perkins, supra; El Paso & S. W. Ry. Co. v. Eichel (Tex. Civ. App.) 130 S. W. 922, Id., 226 U. S. 590, 33 S. Ct. 179, 57 L. Ed. 369. Swearenger is not mentioned in the contract, either by name or office; nor does the buyer stipulate that the seller may, ex parte, select some person and thus give him unchallengeable power of arbitrament. No authority was delegated to him, directly or by indirection; hence, as an adjudication, his decree is without jurisdiction. His certificate and testimony were admissible in evidence, not because they adjudicated anything, but because, as evidence on a material issue, they might assist the court in deciding the disputed point.

4. Not only is the stipulation inapplicable in the sense of appointing Swearenger, or authorizing his ex parte selection, as "grader" whose judgment is to be taken as final, but it contemplates things which, on the record, leave his certificate and testimony with very little probative force, certainly not enough to outweigh, as a matter of law, all conflicting testimony.

A "grading" by some person or persons, at some time, was, assuredly, in the contempla-

tion of the parties, else the Kansas City official standards could not be applied. A testing being in their minds, it must be assumed they contemplated such a test as would be made with due care and an honest purpose and of such extent as would be fairly sufficient to determine the kind of grain tendered. There could not have been a mutual intent that an inspection which would result in classifying rotten wheat as No. 2 red wheat in good condition would be sufficient. Existence of that intent would reflect idiocy, or worse, and it will not therefore be presumed. Testimony tending to show that remarkable condition would, in turn, competently indicate that no such test as was agreed upon had been made. In the absence of a test, the seller would still be obligated to deliver, and the buyer to accept, wheat of the kind agreed upon, and the evidence in question had a direct bearing upon the issue of whether the seller had tendered performance, or had performed his obligation.

[10] It will be remembered 1,000 bushels of wheat were in contemplation, and that 1,000 bushels weigh 60,000 pounds. It was 60,000 pounds of wheat that was to meet the "Kansas City official grades"; and inspection (grading) of the whole, and not a part, was the subject of agreement. The contract does not state the minutiæ of whatever examination was in mind, and the record does not show what is included in the usual and customary inspection at Kansas City. Hence we must assume the term "grades" was employed in its ordinary sense. "Grade" means "to sort according to size, quality, degree of advancement, etc.; as to 'grade' fruit, wheat, or sugar." Century Dictionary and Cyclopedia. Manifestly it could not have been intended that each grain of the wheat be examined. Just how far the inspector should go in the examination need not be determined, for, in all events, the parties intended for him to go far enough fairly to ascertain the quality of the mass and its larger parts. The kind of inspection that Swearenger made is shown by his testimony (offered by Moore-Seaver Grain Company in support of its defense on the stipulation). With a "5-foot trier," inserted at five different locations in the mass of wheat, he gathered and inspected 2,200 grams, about 4¼ pounds, as compared with 60,000 pounds in the mass. When he did this, the wheat was already loaded into the car, and the car was "loaded" to within 24 inches of its roof, and he had not seen the grain before, or as it was being run into the car. He says, furthermore, that, since the 2,200 grams appeared to be dry, he did not make any "moisture test," thinking it unnecessary; such a test, apparently, being one of the things usually (or at least sometimes) done in making an "official inspec-

tion" at Kansas City. Neither a jury, nor an appellate court on a proper review, may rightly ignore physical conditions by which a witness is circumstanced or the maxima potentialities of his vision. And from the facts disclosed, it is certain that there may have been many things pertaining to the mass of the wheat about which Swearenger could not be advised. There were 59,995 pounds (out of 60,000) that he did not actually examine; and the overwhelmingly larger part of it he did not see at all. Grading based upon examination of $1/_{12000}'$ part of it might have ascertained its true quality, but it (and more easily) might not have done so. In the absence of a very definite agreement to the effect that such an examination would be sufficient, or an agreement that some previously selected arbiter should pass judgment (and in doing so employ his own methods), or in the absence of evidence very clearly demonstrating that such a test was the usual one, and such as would likely produce correct results, it cannot reasonably be said that this "inspection" came within the intent of the parties.

[11] Swearenger's "certificate" does not purport to show the condition of the wheat; it merely states it was "No. 2 red wheat." That was not the kind of grain contracted for, at least from the standpoint of the buyer under the issues presented. No. 2 red wheat of good sound condition was what he bought. The certificate itself, therefore, covered only part of the ground. Hence Moore-Seaver Grain Company introduced Swearenger's testimony by way of supplement of the paper. When the testimony and the certificate are considered together, fraud or gross mistake by him is either conclusively shown or the matter is left in such condition as to reflect uncertainty and ambiguity. His inspection was made on April 10, 1922. On that day he said he "examined one more car of wheat which had been loaded from the same elevator as the car in controversy was loaded from." He said, further:

"The initials and number of the other car was C. & E. I. 61681, and my inspection report showed it contained No. 2 red wheat, 58-pound test, 60 per cent. dark. On 'Swearenger Exhibit No. 2' I have shown a copy of my report on this car."

The "exhibit" just referred to shows his "report" on both carloads; it states that the car in question here contained "red wheat" and that the other car contained "No. 2 hard wheat" which was 60 per cent. "dark." Either his certificate or his testimony as to the contents of C. & E. I. car 61681 is incorrect, for in one place he said it was "red wheat" and in the other he said it was "hard wheat." According to his testimony the wheat making up the loading of both cars came from "the same elevator" on the same

day. At least, in the absence of a more definite explanation, the presumption that it was all of about the same class and condition could have been indulged (properly) by the jury; and yet part of it was shown to be damaged to the extent of being 60 per cent. "dark" and the balance was shown to be in good condition. His testimony and his certificate could not be literally true; under one construction of them, at least, gross mistake or worse is reflected. And, too, this is developed by the grain company itself in its effort to show the conclusively binding force of his "inspection." That being true, it certainly required of the buyer no specific allegation of fraud or mistake in order for him to deny the supposedly incontrovertible effect. As to this affirmative defense, the seller found itself in a position analogous to that of the plaintiff in a personal injury suit who affirmatively develops contributory negligence in making out his case. We would not be understood as intimating that the buyer's allegations here would not be sufficient if it were essential to plead fraud or mistake. We put our conclusions on grounds which render that question immaterial, and on it we express no opinion. Even in cases where the parties to an executory sales contract have appointed (therein) an ascertained person exclusively to "grade" or "weigh" the goods, the agreement necessarily implies that his "grading" or "weighing," in order to be conclusive, must be the resultant of due care and honest purpose. And, if his report should affirmatively disclose gross mistake or dishonesty, it would be impotent to hold the parties, and would bear in its face the indicia which would unbind them.

There is not, therefore, in pleading, testimony, or the "report" itself, any reason disclosed for giving to Swearenger's conduct the obligatory effect claimed for it.

And there is in the record another report of another "official" inspection which carries no badge of error or fraud, and which was as much within the contemplation of the parties when they made the contract as was any inspection Swearenger might make. From the terms of relevant federal law (U. S. Grain Standards Act, 39 Stat. L. 482; Fed. Stat. Ann. 1918 Supp. p. 7; Barnes' Fed. Code, §§ 8192–8202 [U. S. Comp. St. §§ 8747½–8747½k]) we know that this interstate shipment had to be inspected by some person or persons duly authorized. We assume, therefore, that all persons who did inspect and make reports were licensed to do so; i. e., their "inspections" were "official," at least when so represented, as here, by the seller. The bill of lading issued to the seller at Kansas City and by it delivered to the buyer at Blum carried on its face an inspection report over the signature of "Western Weighing & Inspection Bureau" wherein the grain was classified, etc., as being merely "bulk wheat"; i. e., the bill of lading described the shipment as being "one car bulk wheat" weighing 60,000 pounds, and the certificate states that "this shipment is correctly described." This "report" does not, in its terms or implications, purport "grading" within the bulk, and, as is manifest, it would not bind the parties on that point; nor would testimony showing the true condition have the effect of varying or contradicting its terms. It was the certificate tendered to and acted upon by the milling company when it paid the draft. Swearenger's was withheld until it appeared on trial of the lawsuit. As a matter of law, we believe, neither could exert indisputable obligatory force upon the parties, and, viewed merely as evidence, the "Western Weighing & Inspection Bureau" could be the more readily credited, since Swearenger himself developed error, etc., in his conduct.

We recommend reversal of the judgment of the Court of Civil Appeals and affirmance of the judgment of the district court.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.