Edwin D. HARRIS, Appellant,

v.

Henry CLEVELAND, Appellee.

No. 13006.

Court of Civil Appeals of Texas.

Galveston.

Sept. 20, 1956.

Rehearing Denied Oct. 11, 1956.

Second Motion for Rehearing Denied Oct. 25, 1956.

R. E. Schneider, Jr., George West, for appellant.

M. L. Cobb, Edna, Keys, Russell, Keys & Watson, James C. Watson, Corpus Christi, of counsel, for appellee.

GANNON, Justice.

This is an appeal by Edwin D. Harris, a resident of San Patricio County, from an order of the District Court of Jackson County in a suit pending in that county overruling Harris' plea of privilege to be sued in the county of his residence. The plaintiff in the suit was Henry Cleveland. He joined Harris as co-defendant with three residents of Jackson County, the latter being E. W. Meador, Bedford Meador and Lathy Jetton, sued as partners doing business as Meador Bros. & Jetton. The petition alleged a joint cause of action against all of the defendants. It sought damages for claimed breach of contract to weld certain water well casing; and alternatively for negligence in welding the same.

Cleveland controverted Harris' plea of privilege under the provisions of Section 4 of Article 1995, Vernon's Ann.Tex.Civ.St., providing that where "two or more defendants reside in different counties, suit may be brought in any county where one of the defendants resides."

Section 4 has been somewhat extended by judicial construction and it is now established that the venue facts thereunder are (a) the actual residence of one of the named defendants in the county where the suit is brought, (b) the existence of a bona fide cause of action against the resident defendant, and (c) a pleading alleging a joint cause of action against such resident defendant and the non-resident defendant, or a cause of action against the resident defendant so intimately connected with the alleged cause of action against the non-resident defendant that the two may be joined under the rule intended to avoid a multiplicity of suits.

The actual existence of a cause of action against the non-resident defendant is immaterial as a venue fact but proof by evidence of the existence of a bona fide cause of action against the local defendant is indispensable. Stockyards National Bank v. Maples, 1936, 127 Tex. 633, 95 S.W.2d 1300.

In the present case there is no dispute in respect to any venue fact except the actual

existence of a bona fide cause of action against one or more the resident defendants.

Appellant says there is no proof to establish the existence of a cause of action against any resident defendant. Appellee contends the proof is legally sufficient to establish the existence of such a cause of action against the resident defendants and each of them, as well as against appellant.

In his petition the plaintiff Cleveland, a water well drilling contractor, alleges that he "engaged the services" of defendant Harris and E. W. Meador and Lathy Jetton, the latter being members of the welding partnership of Meador Bros. & Jetton, to do welding. The petition further alleges that each of the defendants contracted and obligated himself to do the welding in a good and workmanlike manner; that this was not done and that such failure constituted a breach of the joint and several contractual obligations of the defendants, which breach resulted in substantial damages to plaintiff because of the loss of a water well caused thereby. There are alternative allegations of negligence, and omissions of duty on the part of the defendants, as follows: (1) failure to plug certain holes in the casing, (2) failure to observe that these holes were not plugged before the casing was lowered into the well, and (3) welding plugs inserted into the holes with weak welds.

The proof showed plaintiff contracted with a landowner to sink a water well in a good and workmanlike manner and that he commenced the drilling of such well. The well was to be cased with 16 inch water well non-threaded casing. It was necessary in completing the well that separate joints of such casing be welded together so as to form one continuous length of pipe upon completion of the well.

All of the defendants are experienced welders and the evidence shows that plaintiff employed three of the defendants, namely the defendant-appellant Harris, and defendants E. W. Meador and Lathy Jetton, to do all welding of the 16 inch casing. Necessary welding of the surface casing had previously been done by others. Cleveland separately made arrangements with E. W. Meador and Lathy Jetton for them to do that part of the welding work which they undertook, and separately made arrangements with Harris to do the part which he undertook. Meador and Jetton were employed at an hourly rate of $4.50, Cleveland to furnish them welding rods for their part of the work. Harris was employed to do his part of the welding at an hourly rate of $5.50, Harris to furnish his own rods. There is no evidence of any contract with each other in respect to the work between Meador and Jetton on the one hand and Harris on the other except such, if any, as may be implied from their having worked as a team in performing their welding duties.

The following will explain how the de-defendant welders proceeded about their work:

At one end of each joint of casing there were two clevis holes opposite each other and about 4 inches from the end of the casing (Clevises are "U" shaped lifting tools). On the same end and about 14 inches below the clevis holes and opposite each other were two "bar holes".

The welding and the lowering of the welded casing into the hole was done in the following manner: Clevises were put in the clevis holes. A cable was attached to the clevises and the casing was raised from its position where stored and lowered into the well up to the position of the bar holes. Then a bar was inserted through the bar holes and the ends of the bar were brought to rest on two stationary beams which prevented the casing from dropping into the hole and left some 18 inches of pipe protruding above the beams. The clevises were then disengaged and attached to another joint of casing, which was then raised and centered over the joint in the hole. All work of lowering and raising the casing was done by Cleveland's drilling crew.

None of the defendants participated in this part of the work.

With a top joint of casing thus centered on a lower joint and with the latter partially suspended above the hole, the welders, being appellant Harris and E. W. Meador and Lathy Jetton, would then proceed to weld the two joints of casing to each other. When the horizontal welding was completed, the casing would be raised slightly, the bar would be removed and with the casing in its raised position the welders would then "shut-weld" the four holes in the lower joint. After the shut-welding of the four holes in the lower joint, the string would be lowered into the hole and the top joint placed in the same position, and by the same means, as that previously occupied by the lower joint. The welding proceeded thus to completion.

In doing the above welding work the three welders worked as a crew or team. The three stationed themselves around the casing equi-distant from each other. All of the welders were righthanded and welded from left to right. They worked simultaneously in welding the joints of pipe together, each welding approximately 16 inches around the joint, sometimes more, sometimes less. Each worked more or less in the same position except when one would have to leave the job, when the remaining two would do all of the welding.

The testimony in respect to the shut-welding or plugging of the holes developed that upon completion of the horizontal welding each man would shut-weld whatever holes chanced to be on his side. When another welder was slow in finishing up his welding, one welder might plug as many as two or three of the holes. The relative position of the holes to the three welders stationed around the casing would vary because on occasions the casing would turn when it was lifted to remove the bar, so that on some joints a clevis hole would be directly in front of one welder while on another a bar hole would be directly in front of him.

It is plainly inferable that in hiring out or contracting to do the welding work all of the welders expected and agreed to work as a crew or team in the manner above set out. Plaintiff Cleveland saw the way the welders proceeded with the work and it was satisfactory to him.

Cleveland did not appoint any one of the three welders as foreman or inspector, nor any other person to function in that capacity.

The evidence clearly develops that none of the three welders was authorized, directed, or requested by Cleveland to advise, direct or check the work of any other welder. In relation to the duty of plugging the holes, each welder was obligated only to plug the holes which turned up in front of or near to him. None was obligated or expected to plug holes which turned up in front of the others unless one welder was slower than another in completing his work. None was expected to weld holes on the sides of the pipe opposite from him or to see that same were welded before the string was lowered in the hole. No one of the welders had any right to control or supervise, check, or inspect the work of the others unless that right flows from the partnership existing between Meador and Jetton. It is not customary for one welder to inspect or check another's work, and Cleveland did not expect any of the three welders here involved to do so. Welders resent a fellow worker checking or inspecting their work unless especially appointed as inspector to do so.

Upon completion of the well and the installation of the pump, it developed the well was inoperable because of the failure of the pump to work. An inspection developed that gravel was entering the casing which caused the pump to jam. Cleveland then pulled several hundred feet of the casing and an inspection developed the presence of three unplugged clevis holes. The evidence is this did not result from the failure of weak welds but from the omission of some one or more of the welders to shut-

weld or plug the three holes. Apparently because the casing stuck, it was impossible to remedy the situation and Cleveland had to abandon the well before acceptance by the landowner. On that account he sustained a complete loss of his investment in the well and he sues to recover his damages.

Cleveland's position is, and he admits, that he is unable to establish who should have plugged any of the holes that were not plugged. The failure to plug some one of the holes may have resulted from the separate negligent omission of each of the welders. On the other hand, the failure to plug all three holes may or may not have been the result entirely of the negligence of only one of the welders.

E. W. Meador was not introduced as a witness, but Jetton testified that he had no recollection of neglecting to plug any hole that he saw, and further that he did not see any hole in front of Meador that Meador did not plug—in fact he did not see any unplugged hole in the casing before it went into the ground. There is no testimony to the contrary.

In his brief Cleveland emphasizes that it is impossible to tell which welder did what work on the casing. He says that in a situation such as the present, where it is impossible to ascertain which defendant has caused the injury, but where the proof establishes that the damage is "the proximate result of negligence on the part of one or more of the welders", the policy of the law is to allow a joint recovery against all possible tort feasors. Cleveland therefore contends that he has established a joint tort cause of action against all of the defendants, which of course would show a bona fide cause of action against a properly joined resident defendant.

Cleveland further contends the foregoing proof establishes Harris and his fellow welders, Meador and Jetton, to be *joint adventurers,* so that each is responsible in contract and as well in tort on the theory of imputed responsibility for all acts of the others, whether of omission or commission,

in the prosecution of the welding work. This contention is bottomed solely on the fact that each of the defendants agreed to work and did work in concert as a team. There is no contention of any *express contract* of joint adventure between the defendants.

Since it is not claimed that the evidence authorized a fact finding which would fasten responsibility on any particular defendant, it is evident, unless Cleveland be right in respect to one or the other of his above stated contentions, that the indispensable venue element of the existence of a cause of action against one of the resident defendants is missing and the trial court should have sustained Harris' plea of privilege.

We overrule both of Cleveland's contentions.

■ Generally speaking, a joint adventure is a special combination or undertaking in the nature of a partnership to engage in the joint prosecution of a particular transaction or enterprise in which each of the adventurers is to share mutually on some contract basis in profits and losses, Holcombe v. Lorino, 124 Tex. 446, 79 S.W. 2d 307. The term "joint adventure" is not completely synonymous with the term "partnership", Connellee v. Nees, Tex.Com.App., 266 S.W. 502; but a joint adventure has been referred to as a partnership for a single transaction or venture; a partnership not limited as to liability but limited as to scope and duration. "Courts do not treat a joint venture as identical with a partnership, yet it is universally held that such relation is so similar in its nature to a partnership and *in the contractual relation created thereby* that the rights as to the members are governed by substantially the same rules that govern partnerships." (Emphasis ours.) Thompson v. Duncan, Tex.Civ.App. 1932, 44 S.W.2d 904, 907.

In a well-considered case, Carboneau v. Peterson, 1 Wash.2d 347, 95 P.2d 1043, the Supreme Court of Washington stated that

joint adventure is not a status created or imposed by law but a relationship voluntarily assumed and arising wholly ex contractu; and that a sine qua non of the relationship is a contract either express or implied between the parties to the venture. The indispensable elements of such a contract are said to be a common purpose, a community of interest, and an equal right to a voice in the conduct of the enterprise accompanied by an equal right of control. As in partnerships the joint adventurers occupy to each other reciprocally the legal status of principal and agent. It is the agency of each for the other that imposes liability upon all for torts committed in the prosecution of the venture by any member of the enterprise and this on the principle of respondeat superior. On the other hand, it is the absence of a mutual contract relationship and therefore of agency which exempts employees of a common master from liability for the acts of each other in which they do not participate. An employee is not in privity with and does not have any interest in the contract of a co-employee with a common master. 57 C.J.S., Master and Servant, § 578, p. 348; Zimmer v. Casey, 1929, 296 Pa. 529, 146 A. 130.

For an application of the foregoing principles to fact situations somewhat similar to the present record, see Greer v. Pierce, 1933, 167 Miss. 65, 147 So. 303, and Callahan v. Harm, 1929, 98 Cal.App. 568, 277 P. 529. In these cases it was held that fellow-employees of a common master whose work was interdependent were not liable for each other's negligence in which they did not participate. In the Mississippi case, in ruling on the contention that fellow employees of a common master working interdependently were joint adventurers, the Court said, "As we view the record, there was no joint adventure or enterprise in the eyes of the law. There was interdependence; but no such relation as made them joint adventurers."

■ It is obvious here, we think, that legally speaking there was no joint adven-

ture between all of the defendants. Certainly the separate hiring out to and engaging with Cleveland by the defendants independently of each other to do welding work would not constitute the defendants joint adventurers. The separate employment of Harris by Cleveland did not alone make him privy to the employment of Meador and Jetton by Cleveland. Each could have abandoned his employment contract without liability on that account alone to the others. But it is claimed that the fact that each of the welders agreed with Cleveland to work as a team, or interdependently, with the others constituted them joint adventurers. Tested by the rules above set out, the contention is insupportable. It is clear that by the separate arrangements under which each welder accepted employment from Cleveland to cooperate with the others in doing the work, they did not contract with each other for a mutual interest in the fruits of their separate endeavor. It is even clearer that the evidence reveals no arrangement, express or implied, which created either a right or a duty in any welder to supervise, control or direct the work of the others. In short, there was no *joint* undertaking to accomplish a common purpose. Each welder only undertook to do his share of the work; none undertook responsibility for the share of the others except in so far as such responsibility may be imposed by the partnership existing between the resident defendants. In our opinion, the evidence wholly fails to suggest any contractual quasi partnership relation between all of the defendants; and in the absence of such a contract, express or implied, it cannot be said that the parties were joint adventurers.

On the text of 38 Amer.Jur., Negligence, Sec. 254, and such cases as Oliver v. Miles, 144 Miss. 852, 110 So. 666, 50 A.L.R. 357 and Summers v. Tice, 33 Cal.2d 80, 199 P.2d 1, 5 A.L.R.2d 91, appellee Cleveland seeks to support his contention that in a situation such as the present, where unquestionably damage has been sustained as a result of negligence on the part of some one or more

of the defendants but it is impossible to say which one, it is the policy of the law to hold all jointly and severally liable. The above text reads as follows:

"When the negligence of a member of a joint enterprise causes injury to a third person, such negligence is imputable to the other members of the enterprise and all may be held liable for the injury. Pursuant to this principle, the view has been taken that where two parties were jointly engaged in a hunting expedition and, during such hunt, both fired across a public highway, and a person traveling thereon was shot, the parties are jointly and severally liable, although it is impossible to tell with certainty who inflicted the injury."

, We do not consider either the cited text or the cited cases on which the text is based to be applicable. In Oliver v. Miles, two parties were engaged in bird hunting. In the course of the hunt both fired at a bird approximately simultaneously across a public highway. A pellet from one of the guns lodged in the eye of a person traveling on the highway and as a result the sight of the eye was lost, but it was impossible for the injured party to establish from which gun the offending pellet was fired. The court said [144 Miss. 852, 110 So. 668]:

"In the present case, the parties were engaged in hunting jointly, and both fired across a public highway, which was a negligent act. We think that they were jointly engaged in the unlawful enterprise of shooting at birds flying over the highway; that they were in pursuit of a common purpose; that each did an unlawful act, in the pursuit thereof; and that each is liable for the resulting injury to the boy, although no one can say definitely who actually shot him. To hold otherwise would be to exonerate both from liability, although each was negligent, and the injury resulted from such negligence." (Emphasis ours.)

In Summers v. Tice, the facts and the issue were substantially identical to Oliver v. Miles. The court said [33 Cal.2d 80, 199 P. 4]:

"When we consider the relative position of the parties and the results that would flow if plaintiff was required to pin the injury on one of the defendants only, a requirement that the burden of proof on that subject be shifted to defendants becomes manifest. They are both wrongdoers—both negligent toward plaintiff. They brought about a situation where the negligence of one of them injured the plaintiff, hence it should rest with them each to absolve himself if he can. The injured party has been placed by defendants in the unfair position of pointing to which defendant caused the harm."

Though we find in the facts stated in the opinion no support for the statement of the Mississippi court that "the parties were engaged in hunting jointly," we find no fault with the result reached by either court. (Emphasis ours.) When the relative position of the parties to the Mississippi and California cases is considered, it is only just and right for the law to impose the duty of going forward with the evidence to negative causal responsibility on a party who has participated wrongfully in bringing about a situation which makes it impossible for the plaintiff to discharge his burden of proof. Otherwise a wrongdoer would be in position to inflict injury on his neighbor and escape responsibility. It is clear these decisions are based on justice. In effect they rest on the thought that it should not lie in the mouth of an admitted wrongdoer to deny causal relationship where his own wrong has contributed to produce a situation which makes it impossible for plaintiff to establish such relationship. Compare Landers v. East Texas Salt Water Disposal Co., 151 Tex. 251, 248 S.W. 2d 731.

Here, however, the very basis of decision in the cited cases is wholly wanting. Here none of the defendants is an established wrongdoer. It is not proved that any has participated wrongfully in bringing about the situation which makes it impossible for plaintiff Cleveland to pin responsibility on the actual wrongdoer. Rather the facts

show this unfortunate result flows from Cleveland's own failure to inspect the work of the welders or to appoint some one to do so before lowering the casing into the hole. We regard the principle of decision of the cited cases as manifestly inapplicable.

In passing, we notice the case of Ybarra v. Spangard, 25 Cal.2d 486, 154 P.2d 687, 162 A.L.R. 1258, cited in support of the ruling in Summers v. Tice, supra. In Ybarra v. Spangard, the court applied the doctrine of res ipsa loquitur to establish prima facie joint liability on the part of all doctors, nurses, attendants, etc., having contact with a patient undergoing operative procedure, who sustained a traumatic injury while under anaesthesia. The proof showed the patient committed himself to the care of each of the defendants while under the anesthetic, but not necessarily at the same time. Here the plaintiff Cleveland does not invoke the doctrine of res ipsa loquitur, but even if he had we would not be inclined to press the doctrine to the limits reached in Ybarra v. Spangard. However, we consider the case clearly distinguishable on the facts. In Ybarra v. Spangard, the plaintiff who submitted himself to the care of the defendants while under anaesthesia had no means of observing the conduct of any of them to determine which one was responsible for his injury. In the present case the plaintiff could easily have forestalled the situation in which he finds himself by arranging for inspection of the casing, before it was lowered in the well. This he did not do. To our minds, it would be manifestly unjust to fasten responsibility upon any innocent defendant for the situation in which plaintiff finds himself when plaintiff could so easily have prevented the situation arising. It is a familiar principle of equity and justice that he who trusts most must suffer most.

The judgment and order overruling the plea of privilege is here reversed, and rendered for appellant sustaining same, and the trial court is directed to transfer said cause as to appellant Harris in conformity with appellant's plea of privilege.

Judgment reversed and rendered.

CODY, J., not sitting.

On Appellee's Motion for Rehearing.

For the first time on motion for rehearing and in the face of a plainly irreconcilable position on original submission, the appellee now urges that the evidence authorized the trial court to find, and that the trial court impliedly found, that the negligent acts which caused plaintiff's damage were attributable to Jetton or Meador, and not to Harris; and that plaintiff thus established, in virtue of such finding, a cause of action against the resident defendants which would authorize the maintenance of venue in Jackson County against Harris—the existence of a cause of action against Harris being immaterial as a venue fact since he was properly joined with the resident defendants.

Appellee's position on original submission is fairly reflected by the Conclusion to his supplemental brief, which is as follows:

Conclusion.

"In the case at bar it has been clearly established that the holes in the casing were not plugged by the welders, that gravel got into the wells through the holes in the casing, and that the well was ruined as a result of the gravel getting inside the casing. In other words, there is no question but that damage to the plaintiff had been established and that the damage was the proximate result of negligence on the part *of one or more of the welders*. The policy of the law is to permit a recovery by plaintiff against defendants in such a situation *where it is impossible for the plaintiff to ascertain which defendant has caused the injury,* where the defendants, under the circumstances, were bound to have been acting jointly and in concert. Consequently, plaintiff has established a cause of action against

Harris, E. W. Meador, Jr. and Lathy Jetton, and the liability of each is joint and several; we, therefore, have a cause of action established against E. W. Meador, Jr. and Lathy Jetton, both of whom were shown to be residents of Jackson County, and venue properly lies in that county as against Appellant Harris." (Emphasis supplied.)

There was nothing more plain in appellee's presentation of his case on original submission than that he took the position that the absence of facts at his command made it impossible that the identity of the actual wrongdoer be ascertained. Whether this was motivated by the desire for a joint and several judgment against all defendants is neither material nor for us to say. However, in view of the fact that plaintiff cited and quoted from Louisville Gas & Electric Co. v. Nall, 178 Ky. 33, 198 S.W. 745, in his supplemental brief on original submission—a case which might have supported the contention he now makes for the first time on motion for rehearing—we were doubly careful to make sure that appellee did not even contend the record contained facts from which the trial court would be authorized to conclude that the party, or parties, responsible for the negligence complained of was one, or both, of the active resident defendants.

In view of the foregoing, we think appellee ought not to be permitted at this date to urge on us for the first time, and wholly contrary to his position on original submission the point which he now seeks to make. We, therefore, decline to consider it.

The occasion of our writing on rehearing at all is to forestall our opinion being construed at a trial on the merits as foreclosing the possibility of Cleveland establishing a cause of action either as against the resident defendants on the one hand or the nonresident defendant on the other. The majority opinion in Louisville Gas & Electric Co. v. Nall would indicate that were each of the welders to deny his own responsibility, the jury could accept the testimony of one or more as credible and discredit the testimony of the others, one or both, so as to fasten responsibility where in the opinion of the jury it properly belonged. The dissenting opinion holds the direct opposite. We express no opinion one way or the other on the point, or on any point of estoppel by prior conduct in the proceedings involving the plea of privilege which might arise at a trial on the merits.

The case of Blum Milling Company v. Moore-Seaver Grain Co., Tex.Com.App., 277 S.W. 78, urged on original submission and re-urged on motion for rehearing as supporting the legal position taken by appellee as set out in the quoted Conclusion from his supplemental brief, was carefully considered by us on original submission. Rightly understood and interpreted, we do not think it supports appellee's stated position.

Motion refused.

CODY, J., not sitting.