## National Bank of Kentucky v. Minary, et al.

(Decided November 18, 1927.)

Appeal from Jefferson Circuit Court
(Common Pleas Branch, Second Division).

1. Taxation.—In absence of a restricted meaning, the word "taxes" includes all forms of contribution which a citizen is required to make for the support and maintenance of the government.

2. Vendor and Purchaser.—In contracts whereby one party in purchasing property agrees to pay taxes, the meaning of the term "taxes" must be determined by the particular facts of the agreement involved.

3. Banks and Banking.—In an action by the liquidating committee of a bank, which had been sold to defendant bank upon an agreement that purchasing bank would pay all accruing taxes, to recover tax money which the purchasing bank had refused to pay to the federal government and which the liquidating committee had then compromised and paid, held, that in view of the purchasing bank's denial of liability and that compromise had been recommended by an attorney employed by purchasing bank, liquidating committee had the right to compromise with the government and ask for reimbursement from purchaser.

4. Banks and Banking.—Where one bank purchased another upon an agreement that the purchasing bank would pay the purchased bank's "accruing taxes," but purchaser refused to so pay, whereupon the liquidating committee of the purchased bank paid the taxes and sought reimbursement from the purchasing bank, held, that the term "accruing taxes" embraced federal income taxes, including the purchased bank's profit on its sale, in view of fact that the contract clearly contemplated the complete dissolution of the purchased bank after sale.

5. Banks and Banking.—Where one bank purchased another, agreeing to pay the accruing taxes of the purchased bank, such purchaser thereby became liable for the federal income taxes of the purchased bank which might thereafter accrue, even though the rate for a part of the taxes that would accrue had not then been determined.

6. Evidence.—Under written contract for sale of bank's assets by which purchasing bank agreed to pay "accruing taxes," quoted term held not to involve a patent ambiguity requiring explanation by parol, since to do so might result in making an agreement to which stockholders had not subscribed, as required by Ky. Stats., section 883b-3.

CARROLL & McELWAIN and SELLIGMAN & SELLIGMAN for appellant.

TRABUE, DOOLAN, HELM & HELM for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Affirming.

The appellees, whom we shall refer to as the plaintiffs, recovered a judgment against the National Bank of Kentucky for $22,776.67, with interest from November 24, 1926, and the National Bank of Kentucky has appealed. Previous to May 18, 1918, the German Bank had been engaged in the banking business in Louisville, Ky., for many years, and had established and enjoyed a good business. On May 18, 1918, it sold all of its assets, real, personal, and mixed, to the National Bank of Commerce for the round sum of $1,225,000. Under this contract, the National Bank of Commerce got everything the German Bank had, its business, its personal property, its real estate, its books, in fact, everything, and after the making of this contract, the German Bank had not even a lead pencil. In this contract there was this provision:

"The National Bank agrees to and does hereby assume all the liabilities of the German Bank as

shown on its books, and accruing taxes and agrees to pay the same and to indemnify and save harmless the German Bank against any claim therefor.''

This is the only part of the contract between the two banks about which there is any dispute, and the dispute has narrowed down to the meaning of two words, ''accruing taxes.'' The word ''accruing'' as used here meant taxes to come due or taxes that were then coming due, and as there is no suggestion in the record that the German Bank then owed any past-due taxes, this controversy narrows down to the one word ''taxes.'' The National Bank of Commerce paid for the German Bank, at the proper time, taxes due the commonwealth, the taxes due Jefferson county, and taxes due the city of Louisville. It employed an auditor to make up an account of the German Bank's income and profits from December 1, 1917 (the beginning of the German Bank's fiscal year), to May 18, 1918 (the date of the contract). From the information thus obtained, it prepared an income tax return for the German Bank upon forms prescribed by the federal government, and delivered same to the proper authorities, and simultaneously with such delivery paid $896.88, the tax shown by that return to be due the federal government. On February 3, 1919, the National Bank of . Commerce consolidated with the National Bank of Kentucky, and pursuant to that consolidation the National Bank of Kentucky received all the assets of the National Bank of Commerce, and assumed all its contracts and liabilities. Some time thereafter (the exact date being undisclosed, but possibly some time in 1924) the duly authorized officers of the United States government checked over the income and profits return made for the German Bank by the National Bank of Commerce, and claimed to have found certain errors and omissions therein, all of which resulted in the assertion by the United States government of a claim against the German Bank for additional income and profits taxes alleged to have accrued and become due to the United States government from said German Bank, for more than $100,000, on account of its operations from December 1, 1917, to May 18, 1918. Approximately two-thirds of this asserted tax was claimed on profits accruing to the German Bank upon the sale of its assets to the National Bank of Commerce, and approximately one-third represented profits and income from the ordinary

operation of the German Bank. The National Bank of Kentucky employed an expert in such matters to try to avoid this additional assessment, but was unable to do so. The plaintiffs Thomas J. Minary, Henry J. Angemeier and William S. Speed had been the liquidating committee of the German Bank. The National Bank of Kentucky refused to pay this tax or any part of it, and demanded of this liquidating committee the repayment of the $896.88 which it had paid. The committee then employed counsel and effected a compromise with the government, by the terms of which they paid $20,000 in settlement of the claim. There is nothing in the record to show how much, if any, of this $20,000 was paid as taxes on the profits arising from the sale by the German Bank to the National Bank of Commerce of its capital assets. After paying this $20,000, this committee began this action against the National Bank of Kentucky to recover it. The National Bank of Kentucky resisted payment, and by a counterclaim sought to recover from the committee the $896.88 which it had paid in September, 1918.

There is no dispute about the facts. The demurrer filed by the National Bank of Kentucky to the plaintiffs' petition was overruled. The demurrer filed by the plaintiffs to the answer and counterclaim of the National Bank of Kentucky was sustained, and the judgment appealed from followed for $20,000, which, with interest, amounted to the sum first stated in this opinion.

Counsel for these parties have briefed this case with great ability and elaboration and have cited numerous authorities, a review and discussion of which might be of interest, but would unduly and unnecessarily lengthen this opinion, and we shall not undertake it further than to note generally that practically all of these cases are leasehold cases, and that in cases relied on by the National Bank of Kentucky the terms of the contracts were such as to identify the taxes the lessee undertook to pay as those levied on or assessed against the demised premises, whereas, in the cases relied on by the plaintiffs, words indicating such identity do not appear, and in the absence of words indicating a narrow or restricted meaning, the word "taxes" would include every form of contribution which a citizen is required to make for the support and maintenance of the governments under which he lives. Each case is determined by its own particular facts, and this case must be determined by the

facts in it, and this contract must be applied to these facts, and in its construction we must keep in mind the circumstances under which it was made, the things the parties undertook by it to accomplish, and in the light of these arrive at the meaning of the words used.

Among the cases cited by the National Bank of Kentucky are these: Des Moines Union Ry. Co. v. Chicago Great Western Ry. Co., 188 Iowa, 1019, 177 N. W. 90, 9 A. L. R. 1557; Republic Bldg. v. Gaertner, 201 Ky. 509, 256 S. W. 1111, 30 A. L. R. 982; Young v. Illinois Athletic Club, 310 Ill. 75, 141 N. E. 369, 30 A. L. R. 985. In addition to these cases, they have cited and quoted from many others as well as the numerous cases that are to be found in the annotations following these cases in the A. L. R.

The question before us is: Are the income taxes of the German Bank included within the words "accruing taxes?" The National Bank of Commerce had undertaken to pay the "accruing taxes" of the German Bank, and in order to determine the scope and extent of that obligation we must consider, first, the natural import of the language used, and then read that in the light of the circumstances under which it was used. There is no suggestion that the assessment made by the national government against the German Bank was not for taxes, but it is urgently contended that it was not for such taxes as were included within the term "accruing taxes," as used in the contract between these parties. Both these contracting parties were, at the date of the contract, actively engaged in the banking business, and had been so for some years. Both of them knew that income taxes could be and probably would be assessed by the federal government against the German Bank. Both were chargeable with knowledge that the World War was then prevailing and this government was engaged in that Titanic struggle. Both of them knew the government was expending vast sums in the prosecution of the war, and that probably heavier, rather than lighter, taxes could be expected. As directing officers of these corporations, the men who prepared this contract necessarily knew that a portion of the revenue needed by the government for the prosecution of the war would be raised by taxes on income. They knew such taxes had been levied and collected, and there was nothing in the surrounding circumstances to induce them reasonably to believe that there would be a cessation of such taxation. Therefore

we can say with certainty that they made this contract with such taxes in contemplation.

With the answer and counterclaim of the National Bank of Kentucky there is filed as Exhibit A a copy of the report made by the joint committee of these two banks, and in it we find this:

> "If the board of directors of the German Bank approves of this report, a meeting of the stockholders of that bank should be called to convene on May 18, 1918, for the purpose of dissolving the corporation and adopting the proper resolutions authorizing and providing that the board of directors shall carry out this transaction."

Thus we see the essence of this contract was that the German Bank should sell to the National Bank of Commerce its entire assets and be dissolved. Involved in this intention of the parties was the indispensable necessity of providing for the payment of the debts and accruing taxes of the German Bank, and this was done in the contract by the National Bank of Commerce assuming the payment of them. As the contract required a dissolution of the German Bank, the contracting parties necessarily contemplated a distribution of its assets. What would it have availed the German Bank to procure the payment of some of its taxes by the National Bank of Commerce, leaving other taxes unpaid? To leave some taxes unpaid, and especially federal income and profits taxes, which usually require months and often years to adjust, would prevent the complete liquidation of the German Bank and thwart the very purpose these parties had in mind. It was essential, therefore, that the German Bank should arrange with the National Bank of Commerce for the payment of its taxes, and not some but all of its taxes, in order that the purpose they had in mind might be carried out. The trial court reached that conclusion, and the National Bank of Kentucky now insists that this conclusion was erroneous and urges four grounds for the reversal of the judgment.

Ground A is:

> "That plaintiffs had no right to compromise with the government the question or amount of liability for taxes without the consent of the National Bank of Kentucky."

This compromise had been recommended by an expert attorney employed by the National Bank of Kentucky, and it does not now, nor did it ever, question the wisdom of the compromise, but has simply refused to pay any part of the claim. We had a similar question before us in Interstate Casualty Co. v. Wallins Creek Coal Co., 164 Ky. 778, 176 S. W. 217, L. R. A. 1915F, 958, and we upheld a compromise made under similar circumstances. We had a similar question in the case of F. & C. Co. v. Stewart Dry Goods Co., 208 Ky. 429, 271 S. W. 444, 43 A. L. R. 318, and we upheld that compromise. So we find no merit in ground A.

Ground B is:

> "That the contract term 'accruing taxes' included only state, county, and city taxes; or if it included federal income taxes then the tax upon the profit made on sale was not included."

This position is very inconsistent with the acts and conduct of the National Bank of Kentucky and the National Bank of Commerce for the five or six years that intervened between May 18, 1918, and the date that the National Bank of Kentucky definitely refused to pay the taxes. During all that five or six years they had possession of all the books, papers, records, and accounts of the German Bank. They made an income tax return for the German Bank, and they and attorneys employed by them were endeavoring to reduce these income taxes and avoid their payment. But forgetting for the time their activities in this regard, we find the authorities are against them. See Schlafly v. D'Arcy (C. C. A.) 1 F. (2d) 297; Tevander v. Ruysdael (C. C. A.) 299 F. 746; as well as the case of Republic Bldg. v. Gaertner, supra. We do not know from the record whether or not the contracting parties discussed the question of federal income tax upon the profits made on the sale of the capital assets of the German Bank, but the inference must be that they did so, for the men by whom this sale was brought about and this contract was prepared are leading business men of our state. They are men known to be thoroughly familiar with business affairs, and cannot be presumed to have overlooked this. The National Bank of Commerce undertook to pay these taxes. If the tax had been lowered that would have been its good fortune, and it cannot complain when the tax is increased.

In the case of Perry v. Norfolk, 220 U. S. 472, 31 S. Ct. 465, 55 L. Ed. 548, a lease had been made in 1792, and the lessee undertook to pay the ''public taxes.'' At that time, the borough of Norfolk had no power to tax. Afterwards it became a city and levied a tax on the property in question. The court said those holding under the lessee would have to pay the tax. In North Penn. R. R. v. Phil. & R. Ry. Co., 249 Pa. 326, 95 A. 100, the lessee agreed to ''pay all taxes and assessments . . . for . . . which . . . (the lessor) would otherwise be liable.'' The court held the lessee liable for taxes, and in that opinion said:

> ''At the time the lease was made, there was no such thing as a federal income tax, but the words 'taxes and assessments' are sufficiently broad to cover such tax.''

In Kimball v. Cotting, 234 Mass. 172, 125 N. E. 551, the lessees had covenanted to pay any tax lawfully levied on or against the rent under the lease, whether levied on it as rent or as income of the persons entitled thereto. At the time that lease was made no surtax existed, but the lessees were held liable for surtax when imposed.

In Suter v. Jordan Marsh Co., 225 Mass. 34, 113 N. E. 580, the lessee had agreed to pay all taxes except betterments. In that opinion the court said:

> ''A change in the law as to taxation during the term of the lease is of no consequence.''

In Phil., etc., Ry. Co. v. Phil. R. T. Co., 263 Pa. 561, 170 A. 329, the lessee had agreed to pay all taxes imposed upon the lessor, or for which the lessor would be liable on account of its earnings or profits, and this was held to include federal income and war excess profits tax, although such taxes were not in existence when the lease was made. Similar cases will be found in Phil., G. & N. R. R. Co. v. Phil. & R. Ry., 265 Pa. 325, 108 A. 528; North Penn. R. R. v. Phil. & R. Co., supra; Phil. C. P. Ry. Co. v. Phil. R. T. Co., supra; Welch v. Phillips, 224 Mass. 267, 112 N. E. 651. We can find no merit in this contention for there is no good reason that the German Bank should provide for the payment of state, county, and city taxes, which are readily and easily adjusted, and yet leave unadjusted and unsettled the question of its federal income tax; and as to the so-called profits tax on the sale, we

can see no difference in principle between profits arising from the sale of capital assets and profits arising from any other business activity.

Ground C, urged for reversal, is:

"That if federal taxes are covered by the provision for payment of accruing taxes, then only the taxes for December, 1917, are included, because the tax rate for 1918 was not enacted by Congress until February, 1919."

The fact that the rate was not fixed at the time this contract was made was as well known to one of the parties as it was to the other. Both parties knew there would probably be taxes for 1918 and they knew that the 1918 tax rate might be different from the 1917 rate, and neither party could have expected that the 1917 rate would apply if the 1918 rate were different. They knew the government would fix the rate that its necessities demanded; that taxes would be imposed under the rate so fixed, and when this contract was made the National Bank of Commerce undertook by it to pay such taxes as might be assessed against the property, income, or profits of the German Bank.

The final contention of the National Bank of Kentucky is its ground D, which was:

"That the term 'accruing taxes' involves a patent ambiguity, and that parol evidence is admissible to interpret the contract."

From this record it appears that the negotiations leading up to this sale had occupied several months and when we consider the volume of business and property involved in the sale, we can well understand that many propositions were exchanged and much negotiation was had before the parties arrived at a conclusion, and we cannot find a better statement of the law than this, taken from an opinion by Judge Van Devanter in the case of Union Selling Co. v. Jones (C. C. A.) 128 F. 672:

"Where, without fraud, accident, or mistake, the written contract purports to be a memorial of the transaction, it supersedes all prior representations, proposals, and negotiations, and is conclusive evidence that it embodies such of these are were. ultimately intended to become parts of the agree-

ment, and that all others were rejected as not expressing the final intention of the parties. Bast v. Bank, 101 U. S. 93, 96, 25 L. Ed. 794. If there is uncertainty or ambiguity in the terms employed, the actual condition of things, and the position in which the parties stood at the time of making the contract, may be shown for the purpose of ascertaining the meaning of its terms. Reed v. Insurance Co., 95 U. S. 23, 24 L. Ed. 348. . . . That which may be so shown is frequently spoken of as the surrounding circumstances, but it does not include the prior representations, proposals, and negotiations of a promissory character leading up to, and superseded by, the written agreement. These cannot be thus engrafted upon it.''

The committees representing these two banks did not contract or undertake to contract, but after their various propositions had been exchanged, modified, and discussed, the agreements were finally expressed in the contract before us, and that contract was then submitted for approval to the stockholders of the German Bank. These stockholders acted upon the report and contract alone, and their action consummated the matter. By section 883b-1, Ky. Stats., the German Bank was authorized to sell and convey its property, rights, etc., but by section 883b-3, it is provided that:

"No such sale shall be valid unless consented to by the holders of not less than three-fourths of the capital stock of the vendor corporation," etc.

This contract therefore could not have been executed except by the direction of the stockholders of the German Bank. They are, by virtue of the statute, the real vendors. To permit parol evidence to be introduced to explain the meaning of these two words, "accruing taxes" might possibly result in making of this agreement a contract to which the stockholders of the German Bank never agreed, to which, perhaps, they never would have agreed, and of which they had never heard.

The judgment is affirmed.