[Civ. No. 11312. First Appellate District, Division One.—March 26, 1941.]

BERYLWOOD INVESTMENT COMPANY (a Corporation) [Substituted for ITALO PETROLEUM CORPORATION OF AMERICA (a Corporation)], Plaintiff and Appellant, v. HARLAND B. GRAHAM, as Executor, etc., et al., Defendants and Appellants; LOS ANGELES FIRST NATIONAL TRUST & SAVINGS BANK (a National Banking Association), Respondent.

Farrand & Slosson for Plaintiff and Appellant.

Loeb, Walker & Loeb, Loeb & Loeb and Herman F. Selvin for Defendants and Appellants.

Jennings & Belcher, Frank B. Belcher, Loeb, Walker & Loeb and Louis E. Kearney for Respondent.

WARD, J.—Two separate appeals are presented from a judgment as modified on defendants' motion for new trial. The first involves the construction of an agreement as it bears upon the liability of vending stockholders for federal income tax for a period antedating the sale; and the second, assuming such liability, the question whether the act of a national bank in participating in such agreement as testamentary trustee under the will of one of such stockholders, was *ultra vires*.

The facts of the case are as follows: Prior to July, 1928, the Italo Petroleum Corporation of America, hereinafter referred to as Italo, made an offer to purchase certain oil leases held by the Graham-Loftus Oil Company, hereinafter referred to as the Graham-Loftus or old company, at a price of approximately $3,000,000. During negotiations it was discovered that some of the leases were assignable only with the consent of the lessors and to facilitate the acquisition by Italo a plan was formed whereby all property of the old company other than the particular oil leases desired by Italo, and certain personalty used in connection therewith, should be transferred to a new organization to be known as the Graham-Loftus Oil Corporation, the stock of which was to be issued to the stockholders of the old company. The property transferred to this new company was described as "reserved properties" because, although transferred to the new company, it had been reserved to the stockholders of the old. The properties retained by the old company, consisting of leases, etc., desired by Italo, were referred to as "transfer properties". An agreement was thereafter entered into between the stockholders of the old company and Italo for the sale and purchase of all the outstanding stock of the old company, now divested of the reserved properties, at a price of $441.18 a share, or a total of $3,000,000, payable as follows: The first installment upon the execution of the con-

tract; the second, on September 20, 1928, and the balance in monthly payments to be completed on August 20, 1929. Title to the stock was to pass on payment of the second installment, but the stock was to remain in escrow until payment in full had been made; also the defendants were to retain management and the control of the company until the purchase price was paid in full. Italo was to take charge of the physical operation of the oil properties on payment of the second installment, the purchaser's occupation, however, to be "deemed occupation by and for the old company". The agreement was executed on August 13, 1928, but by its terms it was to be effective as of July 1, 1928.

The agreement provided that "In connection with its operations in and about certain of the properties described and/or referred to in the hereinabove enumerated documents, the old company is the owner of certain personal property located upon certain of said properties. Said personal property and the rights and interests of vendors in and under the documents hereinabove enumerated, in so far as said rights and interests relate to a period subsequent to July 1, 1928 (but excluding any money that the old company may have received and/or may be entitled to receive by reason of its operations and/or activities prior to July 1, 1928, and also all oil and the proceeds from all oil that belonged to the old company and that was in storage at the expiration of June 30, 1928), are hereinafter sometimes referred to as the 'transfer properties.' The old company is the owner of certain property, real and personal, and certain rights and interests in addition to the transfer properties and such other property is hereinafter sometimes designated for convenience as the 'reserved property.' "

Irrespective of the date of the contract, or the time of the payment of the second installment, the business of the company for the year 1928 was divided into two units, that prior to July 1st, and that for the balance of the year. Money on hand as of June 30, 1928, as well as that to which it was entitled by reason of its operations prior to such date, were reserved to the Graham-Loftus company. Italo as the new owner of the stock was entitled to all earnings from and after July 1st, and the provisions of the agreement required dividends declared from net income after such date to be applied toward the purchase price of the stock.

The action arises in connection with an income tax return filed in 1929 by defendants while they were still in control of the management of the Graham-Loftus company, showing the company's net income for a period from January 1, 1928, to July 1, 1928, to be the sum of $598,263.43, on which amount a tax of $71,787.61 was computed and paid by the company. The return covered earnings from both "reserved" and "transfer" properties for the first half of 1928, but the tax was paid from proceeds of its operations during the second half of the year. Subsequently the revenue department of the United States found an additional tax of $7,938.07 to be due on a corrected total net income of $689,235.22. The Italo paid the additional tax after defendants refused to pay.

The action was originally commenced by Italo against a number of defendant stockholders of the Graham-Loftus company, including the Berylwood Investment Company, for the reformation of the contract of sale executed by the litigants. The case was partly tried upon this theory. Subsequently the complaint was amended and reamended by adding two common counts for moneys laid out and expended by Italo for the use and benefit of defendants in the payment of income taxes as above set forth. Judgment was entered denying plaintiff's request for reformation of the contract, but decreeing that under the two common counts plaintiff Italo recover a money judgment against the appealing defendants in the sum of $120,740.67. On motion of defendants for a different judgment, the judgment was modified so as to relieve the Los Angeles First National Trust & Savings Bank from all liability upon the theory that as a national banking association its participation as a stockholder in the agreement of August 13, 1928, was *ultra vires* and not binding upon it. The bank was the holder of certain stock as testamentary trustee under the will of a deceased stockholder. This modification of the judgment is the subject of a separate appeal by the Berylwood Investment Company and will be discussed later. Prior to determination of a motion by defendants for a new trial, the Berylwood company, on behalf of itself and for defendants other than those now appealing, compromised the judgment by paying about 50 per cent thereof, took an assignment of the judgment and caused itself to be substituted as party plaintiff in place of Italo. The defendant stockholders who were not parties to the compromise between Italo

and the Berylwood company have appealed from that part of the original and amended money judgment in favor of plaintiff; the Berylwood company appeals from the remainder of the judgment.

The Berylwood company, as substituted plaintiff, and respondent on this particular appeal, states its position as follows: "As the result of this purchase and substitution Berylwood Investment Company, the substituted plaintiff and appellant, ceased to be a defendant and becomes entitled, under equitable principles and the provisions of the California Code, merely to enforce the judgment so as to secure contribution from any other defendants to the extent of their ratable proportion of the purchase price of the judgment with interest thereon. The judgment therefore, in equity, is no longer a joint and several judgment against the defendants. In other words, the sum of $60,000.00 paid for the judgment, with interest, will be divided amongst the substituted plaintiff and the remaining solvent judgment defendants in the proportion that their several stock holdings bore to each other."

Defendant-appellants (Graham, et al.) contend that a finding that they agreed to pay the old company's income tax, and that Italo expended money to their use is without support in the evidence. The particular provision of the agreement presented for interpretation in this connection reads as follows: "Promptly after the payment of said second installments of the purchase price, vendors agree that they will pay or cause to be paid all bills incurred for labor or material supplied to the old company prior to July 1, 1928, and as well all money, if any, borrowed by the old company in connection with its operations prior to July 1, 1928, and all money due to any person, firm or corporation on account of any matters or things whatsoever relating to said reserved properties, except and unless such obligations relating to said reserved properties have been assumed by the new corporation."

In support of their contention that the payments they agreed to make do not include income taxes, it is specifically claimed that, at the time the contract was executed, any income tax payable by the old company was not due; that even if due at that time in connection with "transferred properties", it was not due in connection with "reserved prop-

erties", earnings from both properties constituting the 1928 income of the company; that even if due, it was due to the United States and therefore not due a "person, firm or corporation", and, finally, that the payment of income taxes was not one of the obligations "assumed by the new corporation" formed by the stockholders of the old. The vital question presented is, should provisions of the agreement of the stockholders to "pay or cause to be paid . . . all money due to any person, firm or corporation on account of any matters or things whatsoever relating to said reserved properties" be construed to cover this income tax?

Defendant-appellants contend that until the end of the year 1928 the amount of income tax for that year could not be ascertained; further, that until the amount may be computed it does not accrue, and if it has not accrued, it is not due. They admit that the net income up to July 1, 1928, could be ascertained, but contend that such income might be materially affected by losses sustained during the remainder of the year. The record does not show such a situation in this case. The income tax paid by Italo in connection with earnings for the second half of 1928 amounted to approximately the same figure as for the first half. The wording of the contract does not definitely indicate that "money due . . . on account of any matters or things whatsoever" embraces income taxes. However, while income taxes are not specifically mentioned, in our opinion the expression "matters or things whatsoever" is broad enough to cover such taxes. The liability, if any, of the selling stockholders for the payment of income taxes arises from their assumption of obligations as set forth in the agreement.

The respective parties discuss the effect of Regulation 74, Revenue Act of 1928. As a rule income taxes are assessed for the entire year. However, certain regulations have been promulgated relative to the filing of separate returns by corporations becoming affiliated with others during the year to cover their respective periods of activity. Whether the regulations covered this particular situation, and whether the filing of a return for a portion of the year was mandatory or optional, is immaterial in the present case. Defendants filed a separate tax return for a portion of the year and the government accepted the tax without objection. Despite the fact that title did not pass until September 20, 1938, the date

adopted for determining the rights in income and property was July 1, 1928. For purposes of income tax that was the agreed date of operation by the new owners.

While the words "due" and "accrued", referring to a liability, mean respectively immediately payable (*United States* v. *Anderson*, 269 U. S. 422 [46 Sup. Ct. 131, 70 L. Ed. 347]; *United States* v. *Woodward*, 256 U. S. 632 [41 Sup. Ct. 615, 65 L. Ed. 1131]), and, payable immediately or later, the second interpretation may be adopted by considering the use of the word in the agreement, in the light of surrounding circumstances. In *Ghirardelli* v. *Peninsula Properties Co.*, 16 Cal. (2d) 494 [107 Pac. (2d) 41], the court said: "In the interpretation of a contract, it is a fundamental rule that all of the writing must be read together and every part interpreted with reference to the whole, so that each provision therein will be effective for its general purpose." The word "due" when read in connection with its context may cover an obligation to become payable at a future time. (*Gelgud* v. *Los Angeles Rock etc. Co.*, 14 Cal. App. (2d) 604 [58 Pac. (2d) 673]; *Joy* v. *Rousseau*, 72 Cal. App. 179 [236 Pac. 972]; *Ahlgren* v. *Walsh*, 173 Cal. 27 [158 Pac. 748, Ann. Cas. 1918E, 751]; 19 Cor. Jur. 818; *Terminal Inv. Co.* v. *Pope Estate Co.*, 122 Cal. App. 281 [10 Pac. (2d) 139].) In *United States* v. *Anderson, supra,* cited by appellant, the court (pp. 440, 441) said: "Only a word need be said with reference to the contention that the tax upon munitions manufactured and sold in 1916 did not accrue until 1917. In a technical legal sense it may be argued that a tax does not accrue until it has been assessed and becomes due; but it is also true that in advance of the assessment of a tax, all the events may occur which fix the amount of the tax and determine the liability of the taxpayer to pay it. In this respect, for purposes of accounting and of ascertaining true income for a given accounting period, the munitions tax here in question did not stand on any different footing than other accrued expenses appearing on appellee's books. In the economic and bookkeeping sense with which the statute and Treasury decision were concerned, the taxes had accrued." (*National Bank* v. *Minary*, 221 Ky. 798 [299 S. W. 985].)

The amount "due" was not an amount agreed upon, but was left to future computation in the ordinary course of business. Likewise "bills incurred for labor or material sup-

plied'' and ''all money, if any, borrowed by the old company in connection with its operations prior to July 1, 1928'', the amounts of which evidently had not been ascertained, all of which indicates that the vendor stockholders agreed to pay any such indebtedness unless the obligation had ''been assumed by the new corporation''. The contract herein seems to be definite that the vendor stockholders assumed obligation for the payment of money due prior to a designated date, but, assuming that it did not, in specific terms, then we may resort to the subject of the instrument and the circumstances surrounding its making. The purpose of construing contracts in the light of the circumstances under which they were made is to ascertain the intention of the parties. (Civ. Code, sec. 1647; Code Civ. Proc., sec. 1860.)

The general plan called for the stockholders of the old company to bear the expenses of operation prior to July 1, 1928, but no part of such expenses for the remainder of the year. Italo was to have no interest in profits from operations prior to July 1, 1928, and was to bear no part of the expenses incident to operation prior to that date. To adopt defendant-appellants' view would result in interpreting the agreement as permitting funds derived from operations subsequent to July 1, 1928, to be applied to the payment of a tax on income from operations prior to that date. In other words, that Italo pay an income tax on income received by the stockholders of the old company. Reading the entire document and considering the surrounding circumstances, it is clear, whether income taxes were mentioned or even thought of during the agreement negotiations, that ''promptly after the payment of the said second installment'' the stockholders were to pay or cause to be paid all bills incurred for labor and material as well as all money borrowed by the old company in connection with its operations prior to July 1, 1928, and ''all money due to any person, firm or corporation on account of any matters or things whatsoever relating to said reserved properties'', which we believe would reasonably include the tax on income prior to said date.

Defendant-appellants suggest that the return for the non-affiliated portions of the year would extend to September 20, 1928, the period of payment of the second installment, since until that date title to the stock did not pass to Italo. Despite the fact that title did not pass, the date specified in the

agreement, July 1, 1928, was adopted as the date of determination of the rights, obligations and benefits of each party to the contract. (*Sanborn* v. *Pacific Mutual Life Ins. Co.*, 42 C. A. (2d) 99 [108 Pac. (2d) 458].)

The contract recites—"all money due to any person, firm or corporation". It is contended that the federal government does not come under any of these classifications, and citations are given in support of such contention, among others, *Vrooman* v. *City of St. Louis*, 337 Mo. 933 [88 S. W. (2d) 189]; *United States* v. *Fox*, 94 U. S. 315 [24 L. Ed. 192]; *Davis* v. *Pringle*, (C. C. A. 4) 1 Fed. (2d) 860; affirmed 268 U. S. 315 [45 Sup. Ct. 549, 69 L. Ed. 974]. Plaintiff-appellant calls attention to authorities holding that the federal government and other governmental subdivisions may be persons within the meaning of a statute. (*Miller* v. *Johnson*, 4 Cal. (2d) 265 [48 Pac. (2d) 956]; *Ohio* v. *Helvering*, 292 U. S. 360 [54 Sup. Ct. 725, 78 L. Ed. 1307]; *Stanley* v. *Schwalby*, 147 U. S. 508 [13 Sup. Ct. 418, 37 L. Ed. 259].) In *In re Tidewater Coal Exchange*, 280 Fed. 648, the terms of a contract disclose that the intention of the parties thereto was that outstanding obligations of indebtedness should be paid. If payment is made to a party legally entitled thereto, it is immaterial whether such party is a governmental agency, a corporation or a person. The designation of the party to be paid is incidental and subordinate to the general intent, as expressed in the writing. (Civ. Code, sec. 1650.) Here the undertaking is to pay any indebtedness "relating to said reserved properties, except and unless such obligations relating to said *reserved properties* have been assumed by the new corporation." (Italics added.)

The "reserved properties" included, as we have seen, those transferred by the old company to the new corporation. Since certain oil leases were not thus transferred to the new corporation, but retained and held by the old company after its stock had been acquired by Italo, appellants argue that a tax computed on income from operation of such leases did not arise from reserved properties, but rather from properties which Italo desired to and actually acquired. Or, in the words of defendant-appellants in their opening brief: "If we assume that on July 1, 1928, the old company's liability for income taxes on its earnings for the first half of 1928 had accrued and become due it would still be necessary,

to bring it within the category of debts assumed by the stockholders, to show that it was 'money due . . . on account of any matters or things . . . relating to said reserved properties'. And only to the extent of such showing would there be any liability on the defendants.'' There was no attempt made to segregate the earnings and the income tax payable thereon as between properties retained (the transfer properties) and those reserved. All that was shown was that the tax was assessed and paid on all earnings of the old company for the first half of 1928.

It is further argued that the right to a money judgment is not established where the existence only of the obligation is proven and not its amount. (*Byron Jackson Co.* v. *Woods,* 41 Cal. App. (2d) 777 [107 Pac. (2d) 639].) The full amount of the obligation, that is the tax, was proven. The term ''transfer'' as applied to certain of the properties relates to a condition which arose on July 1, 1928. The tax was imposed on the income prior to that date. Whether it arose from earnings on ''reserved'' properties or otherwise, appellants have not presented any reasonable theory why Italo should assume taxes on income of which it received no part. The scheme or plan of the agreement was to enable Italo to acquire the leases without necessity of obtaining the consent of the lessors to the transfer. The income from operations prior to July 1, 1928, was in fact from the entire property of defendant-appellants, and therefore, of course, arose partly from the reserved property, and to that extent a tax measured by such income is an obligation ''relating to'' such property within the reasonable meaning of the contract, notwithstanding that income tax is technically not a tax on income on the property from which it is derived, but a personal tax measured by income. Whether it be considered as a personal tax measured by income or a tax on income derived from property, in this case it was an obligation to pay from income on property for a period in which Italo had no interest, and it therefore falls within the classification of ''reserved'' property as that term was used in the contract. Appellants recognized this condition of affairs by filing an income tax return for the first half of the year 1928 without claim of segregation relative to liability for the tax. The tax, except the additional amount assessed by the revenue department, was paid by defendants during 1929, and while they were still

in control of the old company, out of the proceeds of its operations during the second half of the year. Under the terms of the contract such proceeds belonged to plaintiff Italo for application on the agreed purchase price. Proceeds which should have been available as dividends to that company were expended by defendants in the payment of their income tax. Considering all the surrounding facts and circumstances, defendants, by necessary implication from the provisions of the contract, were obligated to pay the tax without resort to funds which under the contract belonged to Italo. The finding that plaintiff expended money for the use of defendants is supported by the fact that defendants diverted funds belonging to Italo to the payment of their tax. The judgment against defendant-appellants should be affirmed.

We now take up the question of the separate appeal brought by the Berylwood company "from so much of the said amended judgment as orders, adjudges and decrees that plaintiff take nothing from defendant Los Angeles First National Trust & Savings Bank". Defendant bank, as successor of Pacific Southwest Trust and Savings Bank held stock in the Graham-Loftus Oil Company as trustee of the estate of David T. Perkins; it participated in the agreement above referred to between Italo and the stockholders of the Graham-Loftus company, and its position until the modification of the judgment was identical with that of the other defendants. It states its position as follows: "We have studied the opening brief filed upon behalf of the appellants Harland B. Graham, etc., et al., in their said separate appeal from the judgment. We find such brief to express our views of the law exactly. Rather than to repeat the arguments therein set forth in this brief as constituting reasons why the judgment in favor of this respondent should be affirmed, we hereby adopt the arguments of said opening brief of appellants, Harland B. Graham, etc., et al., *in toto,* and request their consideration by the court upon our behalf."

Several points raised by respondent bank should be disposed of prior to consideration of its main point on appeal. It contends that this appeal by the Berylwood company is ineffective, in that the elements necessary to the right of contribution do not exist because the right, if any, is based on a claimed right of equitable contribution; that the situation of respondent differs sharply from that of its original co-de-

fendants; that the Berylwood company does not stand in *"equali juri"* to enforce contribution against this respondent; that, whatever may have been the rights of Italo to a reversal of the judgment in favor of respondent, the substituted plaintiff Berylwood company, a former defendant, is without the right of appeal.

The judgment in favor of Italo is referred as joint and several. The Berylwood company as a defendant was liable, subject to affirmance or reversal on appeal, for the full amount thereof, as were all other defendants in the action. By paying the judgment Berylwood substituted for an uncertain total liability, a limited loss. Under such circumstances in making payment and taking an assignment of the judgment it was not a volunteer. In *Tucker* v. *Nicholson*, 12 Cal. (2d) 427 [84 Pac. (2d) 1045], an action brought by a co-obligor, who had satisfied a judgment and taken an assignment thereof, to compel the other judgment debtors to pay their proportionate shares, it was held that the judgment was kept alive in equity to be used by the paying debtor to recover from his co-obligors their proportions thereof, which, in an action against them for contribution, may not be held to be more than their respective proportions of the debt in the absence of a showing of insolvency of one or more of the co-obligors. The court said (p. 433): "A creditor by suing less than all of those jointly liable to him cannot deprive a debtor paying him of the right to hold each of his co-obligors for their proportion of the debt." In the present case by modification the judgment eliminates the respondent as an obligor. It is respondent bank's theory that by reason of such elimination its co-defendant, as assignee of Italo, may not maintain this appeal. This is not an appeal from a judgment assessing proportionate liability, but from the order eliminating respondent from all liability. If a creditor may not deprive a paying debtor of the right to hold co-obligors who were not named as defendants in an original proceeding, then there is no hesitancy in holding the right of appeal to a co-obligor, paying in full or compromising the obligation, to determine the legal correctness of a modified judgment eliminating from liability one of the original alleged obligors. (13 Am. Jur., pp. 57, 58, sec. 63.)

It is a general rule that parties to a judgment are not bound by it as between themselves unless they were adversary

parties in the original or prior proceeding. (*Standard Oil Co.* v. *John P. Mills Organization*, 3 Cal. (2d) 128 [43 Pac. (2d) 797].) During the trial of the action brought by Italo, the interests of the Berylwood company and respondent were not adverse. Upon modification of the judgment, the interests of all defendants, including the Berylwood company, became adverse to that of the exonerated bank. Upon substitution and assignment of the judgment to the Berylwood company, its interest became adverse to all other defendants held liable for the indebtedness, their interests being to establish non-liability. It is to the advantage of the Berylwood company under the assignment of the judgment, or under its original position as a co-defendant, that the maximum number of parties be held liable, since in a proceeding for contribution the loss is divided among the solvent obligors. Upon exoneration by the amended judgment, respondent bank had no material interest in the appeal by the other obligors except in the event its elimination should be held erroneous. However, respondent realizing this contingency, has adopted the position of the other defendant obligors and requested consideration on its behalf of the contentions urged by them on their appeal. To that extent what has been said on the appeal first considered herein is applicable to respondent.

The elimination of respondent from the judgment created an adverse situation between it and the Berylwood company and placed the latter in the position of an aggrieved party and therefore entitled to appeal. (Code Civ. Proc., sec. 938.) *Luckenbach* v. *Laer*, 190 Cal. 395 [212 Pac. 918], cited by respondent, is not in point. In that case ''appellants were not parties to the proceedings resulting in the original orders''.

The appeals herein, when finally determined, will be conclusive as between the substituted plaintiff and the defendant obligors on the question of the existence of a liability, which must be shown to exist before there can be a right of contribution. Questions of whether a debtor's situation is such that he should not be called upon to contribute, depending upon such factors as the propriety of the sum paid to the creditor in discharge of the debt, whether a particular obligor has been legally discharged of the indebtedness other than upon points raised on this appeal, and the solvency of the several debtors, are not involved on this appeal. Such questions may or may not be pertinent in a subsequent pro-

ceeding for contribution upon joint liability. (Civ. Code, sec. 1432.)

The main question presented on the present appeal may be stated as follows: Was the participation of respondent, a national bank, in the contract of August 13, 1928, *ultra vires*? Respondent seeks to demonstrate that the bank had no power to make a contract such as the agreement herein to pay certain debts, although it is not contended that the bank as trustee was without power to sell the stock. The bank signed the agreement "Los Angeles-First National Trust & Savings Bank, By C. J. Hall, Vice-President". Appellant Berylwood company contends that the bank was acting as trustee for the David T. Perkins estate, and respondent bank admits that this "statement is correct". The bank filed its brief as trustee and accordingly we assume that its position is such.

National banks, in the sphere of ordinary banking business, have such powers as they are given by statutes enacted by Congress. Their powers can be no greater than those which the statute expressly confers, and "all such incidental powers as shall be necessary to carry on the business of banking; . . . *Provided,* That the business of buying and selling investment securities shall thereafter be limited to buying and selling without recourse marketable obligations evidencing indebtedness of any person, copartnership, association, or corporation . . . " (Rev. Stats., sec. 5136; July 1, 1922, chap. 257, sec. 1, 42 Stat. 767; Feb. 25, 1927, chap. 191, sec. 2, 44 Stat. 1226.)

Respondent contends that under the terms of the agreement the sale of stock was not "without recourse". Conceding that the contract would be *ultra vires in toto* if executed by a national bank in its general banking capacity, upon the general theory of protection to depositors, stockholders and the public from hazards of contingent liability, and that it was not within the scope of the powers of the bank to perform it under any circumstances (*Awotin* v. *Atlas Exchange Nat. Bank,* 295 U. S. 209 [55 Sup. Ct. 674, 79 L. Ed. 1393] ; *Miners' Ditch Co.* v. *Zellerbach,* 37 Cal. 543 [99 Am. Dec. 300] ; *National Bank & Loan Co.* v. *Petrie,* 189 U. S. 423 [23 Sup. Ct. 512, 47 L. Ed. 879] ; *McCormick* v. *Market Nat. Bank,* 165 U. S. 538 [17 Sup. Ct. 433, 41 L. Ed. 817] ;

*California Nat. Bank* v. *Kennedy,* 167 U. S. 362 [17 Sup. Ct. 831, 42 L. Ed. 198] ; *Standard Livestock Co.* v. *Bank of California,* 67 Cal. App. 381 [227 Pac. 692] ; *Colley* v. *Chowchilla Nat. Bank,* 200 Cal. 760, 769 [255 Pac. 188, 52 A. L. R. 569]), still if the contract was entered into by the bank in its representative capacity as trustee, with the consent of the interested parties, such as the beneficiaries of the trust, it may or may not be *ultra vires* depending upon the circumstances of the case. (*Colley* v. *Chowchilla Nat. Bank, supra.*)

Prior to 1913, by statute and judicial construction thereof, a stringent rule in reference to the capacity of national banks to enter into contracts was in effect. In that year under the Federal Reserve Act (38 Stat. 251, chap. 6), permission and power were granted national banks to operate through trust departments, and this enlargement of activity was held to be constitutional. (*First Nat. Bank* v. *Fellows ex rel. Union Trust Co.,* 244 U. S. 416 [37 Sup. Ct. 734, 61 L. Ed. 1233].) In 1918 the activity of national banks as fiduciaries was expanded by the grant of power to act in ''any other fiduciary capacity in which State banks, trust companies, or other corporations which come into competition with national banks are permitted to act under the laws of the State in which the national bank is located''. (Federal Reserve Act 1918, sec. 11 (k) ; 40 Stats. 968, chap. 177, sec. 2.) In a word, that national banks should be allowed to compete with state banks but in so doing there should be a substantial compliance with state requirements. (*Estate of Wellings,* 192 Cal. 506 [221 Pac. 628] ; *Missouri* v. *Duncan,* 265 U. S. 17 [44 Sup. Ct. 427, 68 L. Ed. 881] ; *First Nat. Bank* v. *Fellows ex rel. Union Trust Co., supra.*) The Enabling Act of 1918 directed that trust funds should be segregated and kept apart from the general funds of the bank. ■ Of course, any effort on the part of the state to curtail national banks' powers is unconstitutional. However, the national bank is confined in its activities to powers granted state banks within the same jurisdiction. (*Fidelity & Deposit Co.* v. *Deposit Guaranty B. & T. Co.,* (Miss.) 144 So. 700; *Goldwater* v. *Oltman,* 210 Cal. 408 [292 Pac. 624, 71 A. L. R. 871] ; *Dunn* v. *McCoy,* 113 Fed. (2d) 587.) ■ Generally the rule in relation to national banks is that failure to expressly grant power negatives its existence, but different regulations in various states forced the federal government, in its purpose to permit national

banks acting in a trust capacity to compete with state banks, to place them on a parity; that is, give the former privileges and powers of the state bank, which, however, presupposes their assumption of like obligations. Otherwise successful competition would be difficult of realization. If members of the public doing business with a national bank in trust matters are denied rights and the benefit of obligations enjoyed by them in respect to state trust companies, there would in all probability be a gradual cessation of business with national trust concerns.

It is true that the national trust company did not receive the proceeds of the sale of the stock for itself, but it was paid in the ordinary course of business to manage the trust. An individual trustee would have been liable on the contract. In California the officer qualifying on behalf of a trust corporation "shall be liable for the failure of such trust company to perform any of the duties required by law to be performed by an individual acting in the capacity and subject to like penalties". (Stats. 1923, chap. 93, sec. 90, p. 173 [Deering's Gen. Laws, 1923, Act. 652].) Since an individual acting as trustee would have capacity to enter into such an assumption of debt liability as that herein under consideration, it follows that a trust company may be liable depending "upon the circumstances of the case". (*Colley* v. *Chowchilla Nat. Bank, supra.*)

It is not to be understood that the effect of the analysis herein is to free national banks from all restrictions when acting in a trust capacity. It may be possible that as regards the hazard of loss there would be no difference in so far as the interests of depositors are concerned whether the bank engaged in an activity in its trust or its regular banking capacity. If general assets of a national bank are available to satisfy its obligations arising from trust activities, then there may be, depending upon the facts of a case, some good reason to relieve the bank, upon the theory that the depositors and stockholders are entitled to primary consideration, and so we return to a consideration of the rule set forth in the Chowchilla case, namely, liability depending upon the facts of the case.

What, in fact, occurred in the present case? Respondent, with co-obligors, agreed to assume individual full liability for all bills incurred for labor or material, all money bor-

rowed and moneys due on account of any matters or things whatsoever relating to certain property prior to a certain date. Respondent's position seems to be that the contract is only *ultra vires* when interpreted as applying to the tax liability. If the arguments in that respect are sound, they would apply equally to bills for labor and material and responsibility for borrowed money. The liability for the tax would not seem to be more speculative than amounts for other indebtedness. The difficulty in ascertaining the amount of the income tax was more fancied than real as demonstrated by the filing of the income tax return covering the period in dispute. It appears to have been an easy matter to compute the tax on the first six months' income. The contingency was not as to the amount of the tax, but as to the amount each stockholder would finally pay through adjustment of contribution.

██ A guarantee, or, as in this case, a direct primary obligation (*First Nat. Bank of Chattanooga* v. *Bell*, 97 Fed. (2d) 683) on the part of a national bank to pay speculative amounts is *ultra vires* when depositors or stockholders of the bank will be held liable. ██ Eliminating subsequent events, which will be referred to hereafter, at the time of the execution of the agreement, the bank, as a trust corporation, did not impose any liability upon the depositors or stockholders of the national bank. The trust corporation as trustee appeared as an agent for the beneficiaries of the trust fund. Whatever gain or loss occurred was to be credited or debited to the particular testamentary trust. All operations of the Perkins trust while under the management of the bank were approved by the son of the trustor, who was also a stockholder and director of the old Graham-Loftus company. The amounts guaranteed were not speculative but ascertainable. Viewing the contract, and the surrounding circumstances, the bank, the bank as trustee, the trust itself, could not in the ordinary course of business lose money on this transaction so far as the trust was concerned, assuming that the trust funds were kept intact. The contract was within the scope of the bank to perform under the circumstances and facts in this case and therefore not *ultra vires*.

Up to this point the contract and the surrounding circumstances have been viewed as they appear in the record, including the rendition of the original judgment, wherein this respondent was held liable to Italo. The assignment of the

judgment by Italo to the Berylwood company in fact has benefited respondent's position by decreasing the amount of liability.

Appellant Berylwood contends that a vendor in a contract of sale who has received and retained the benefits of full execution by the vendee cannot repudiate obligations while retaining the benefits; that want of capacity to enter into the contract sued upon is waived by failure to plead it and that the doctrine of estoppel is available to it. In view of the conclusion reached on the questions already discussed, it is not necessary to consider these points.

Respondent states, though the record is silent thereon, that the trust has been closed and the assets distributed to the beneficiaries; that if contribution is proper it should be by contribution from the trust beneficiaries. We are not permitted to consider the suggestion on this appeal. The contract was not *ultra vires* respondent. Possible future litigation is of no concern on this appeal.

The portion of the judgment in favor of the respondent bank is reversed; the balance of the judgment is affirmed. The trial court is directed to take such action as may be necessary to conform to the views herein expressed.

Peters, P. J., and Knight, J., concurred.

Petitions by defendants and appellants, and by respondent, for a rehearing were denied April 25, 1941, and defendants and appellants' petition for a hearing by the Supreme Court was denied May 22, 1941.