**Walter WOODRUM, Appellant,**

**v.**

**Ray COWAN and Jake Jacobsen,
Appellees.**

**No. 11817.**

Court of Civil Appeals of Texas,
Austin.

May 26, 1971.

Rehearing Denied June 23, 1971.

Schulz, Hanna & Burke, W. L. Burke, Jr., McMahon, Smart, Sprain, Wilson & Camp, J. M. Lee, Abilene, for appellant.

Mitchell, Gilbert & McLean, Wallace A. McLean, Austin, for appellees.

O'QUINN, Justice.

Walter Woodrum, now the appellant, brought this suit against Ray Cowan and Jake Jacobsen for recovery of damages for breach of a written contract.

Cowan and Jacobsen filed a motion for summary judgment, and upon final hearing the trial court granted the motion and entered judgment that Woodrum take nothing.

We reverse the judgment of the trial court and remand the cause for trial on the question of damages.

The record before the trial court and before this Court includes the pleadings of the parties, eight oral depositions, three written interrogatories, affidavits and opposing affidavits, and briefs and arguments of counsel.

Prior to and for some four months after October of 1964 Walter Woodrum was president of the Bank of Commerce of Abilene, Texas, and owned about 73,682 shares of the common stock of the bank. In October of 1964 Ray Cowan and Jake Jacobsen acquired 68,926 shares of the bank's common stock, and on the date of this acquisition Woodrum, Cowan, and Jacobsen entered into a written contract under the terms of which they pooled all of their common stock, amounting to 142,608 shares. The parties to the contract agreed not to sell any of this block of stock to any other person without agreement of all parties to the contract. The parties also agreed to vote the entire block as a unit as long as any part of the shares were the subject of a pledge agreement with the Fort Worth National Bank of Fort Worth, Texas, where the parties had borrowed $426,897.35 in acquiring the common stock.

After this agreement, Woodrum continued as president, Ray Cowan became chairman of the board of directors, and all three of the men served as directors of the Abilene bank. About four months later some discord developed between Woodrum and the other two men. Cowan as chairman of the board refused authorization for Woodrum to receive a salary as president, and during the months of March and April of 1965 Woodrum was not paid. Woodrum was asked to move his offices from the bank itself into disconnected offices in the bank building. Woodrum testified by deposition that in other ways Cowan and Jacobsen interfered with his administration and.that the course of conduct pursued by Cowan and Jacobsen was intended by them to put economic duress on Woodrum and compel him to sell his stock to Cowan and Jacobsen. The record shows that Wood-

rum did sell his stock to Cowan and Jacobsen under terms of a written contract entered into by the three men on May 12, 1965.

The basis of this lawsuit, which Woodrum subsequently brought against Cowan and Jacobsen, is the contract the parties made on May 12, 1965, which Woodrum alleged appellees breached by selling a controlling interest in the bank without sharing with him one-third of the profit as provided in the contract.

The provision of the contract upon which Woodrum relied in bringing suit reads:

"It is agreed by and between the parties that in the event that Ray Cowan and Jake Jacobsen should sell controlling interest in the bank, or a sufficient amount of stock to amount to 51% of the bank's authorized capital stock to any one person, firm or corporation at any time within the next 2 years at and for a profit, that the said Ray Cowan and Jake Jacobsen will pay to Walter Woodrum his ⅓ share of the profit."

The contract also provided that "this contract is made in consummation of, implementation to and in accordance with the agreement of October, 1964 between the parties * * *" under which each of the three men held one-third of the block of 142,608, of which Woodrum initially owned 73,682 shares.

Cowan and Jacobsen sold the entire stock holdings to a group of five men on September 3, 1965, or within less than five months after the agreement of May 12. Under the contract, as noted, Cowan and Jacobsen agreed that if they sold a controlling interest in the bank "to any one person, firm or corporation at any time within the next two years" for a profit, they would "pay to Walter Woodrum his ⅓ share of the profit."

The principal question is whether sale of the stock, which the record shows was a controlling interest in the bank, to the group who purchased the stock constituted a sale to "one person, firm, or corporation" within the meaning and intent of the contract of May 12. Stated more precisely, the question is whether the five principals who acquired control of the bank from Cowan and Jacobsen were so constituted legally as to be considered a firm within the meaning and intent of the contract.

The five men who bought the stock together were business and professional men in Abilene. Two of the men, Hal McGlothlin and Jack McGlothlin, were brothers engaged in various common interests, and were the purchasers who later furnished for the group $50,000 in earnest money in connection with the purchase. David Fry was a close friend of the McGlothlins and is shown to have had considerable banking experience. By prior agreement among the purchasers, Fry later became president of the bank. Joe Corbin, who by prior agreement later became chairman of the board of directors of the bank, was a brother-in-law of the McGlothlins. The fifth member of the group was Randall Jackson, an attorney having experience in banking who was also general counsel for another bank in Abilene. Jackson later became trustee for the group in handling money borrowed by the purchasers from the Fort Worth National Bank and in making distribution from the trust account of the funds due various persons, including Cowan and Jacobsen as the sellers of the stock.

Initial negotiations in behalf of the group was handled by Randall Jackson at the request of the purchasers. In the course of the negotiations Cowan represented that he would be able to deliver to the group controlling interest in the bank. Joe Corbin testified in answer to written interrogatories that " * * * the understanding and agreement between the five people was that the controlling interest in the bank would be acquired and that it would remain as a single block so that con-

trol of the bank would remain in one single block."

It is undisputed that the purchasers felt that control of the bank was needed to insure continuity and centralized management, affording the right to dictate policies of the bank without interference from splinter groups. They were in agreement, and Cowan concurred, that holding controlling interest was of grave importance in administration, as well as in economics, and that a control block of stock was worth more money on a per share basis. Corbin testified that the five purchasers agreed that losses previously suffered by the bank and the consequent tax losses that could be carried forward would be used as offsets against income which three of the purchasers anticipated in the future. As it later turned out the extent of the losses were greater than the purchasers expected, although they recognized in advance that some losses would be experienced.

Following the initial negotiations between Cowan and Jackson, a meeting in Baird, Texas, was attended on August 28, 1965, by Hal McGlothlin, Corbin, Fry, and Jackson, representing the purchasers, and by Cowan, Jacobsen, and J. W. Munson, who acted as trustee for Jacobsen in making a contract to sell. Jackson took the lead in negotiations in behalf of the purchasers, which resulted in a contract by which Cowan and Jacobsen agreed to sell 163,000 shares of stock in the Bank of Commerce for $6.90 per share. Earnest money in the amount of $50,000 was deposited in the Austin National Bank in Austin, Texas. Although Jack McGlothlin was not at the meeting, he testified that he had discussed the proposed purchase in advance with the other men in the group and the agreement made by them was with his sanction.

The contract provided that Cowan and Jacobsen could vary the number of shares subject to transfer, but the figure could not be reduced below fifty-one percent of the outstanding stock of the bank.

These negotiations culminated on September 3, 1965, in Fort Worth at the Fort Worth National Bank, with transfer of the Cowan and Jacobsen block of shares, in the amount of 162,191 shares. The stock was deposited in the Fort Worth bank, with all certificates executed in blank. The five purchasers executed a joint and several note in excess of $1,000,000 to the bank for the funds with which Jackson, as trustee for the group, paid Cowan and Jacobsen. At the time of these transactions the purchasers had not decided among themselves how the stock would be apportioned, a matter to be determined by them later.

The joint and several note executed by the five purchasers was the subject of a pledge with the Fort Worth bank under the terms of which control of the Abilene bank was to be maintained by the group as long as the note was outstanding and unpaid. The note was further secured by a pledge of stocks separately owned by the two McGlothlins and by Corbin.

In connection with the sale of the stock to the group, Cowan and others transferred by deed the real estate upon which the Abilene bank was located to Jackson as trustee. Jackson testified, "The property deeded to me as trustee was donated as contributed capital to the Bank of Commerce. It was originally deeded directly to the bank; when the bank management and the State Banking Department did not agree on the method of carrying it on the books, then a loan was secured from the First Savings and Loan Association of San Angelo, and the monies received were donated to the bank as contributed capital."

At the time of the sale of stock in September, 1965, the total of outstanding shares of common stock in the Bank of Commerce was 230,000. The sale of 162,-191 shares was in excess of the fifty-one percent required by the group who purchased from Cowan and Jacobsen. Appellees Cowan and Jacobsen argue that they

did not sell a controlling interest in the bank, but that as to 47,536 shares they acted as a sort of conduit for shares held by Sydney Niblo of Abilene. The basis for this contention is found in a buy-and-sell contract Cowan and Jacobsen made with Niblo about June, 1965.

After Cowan and Jacobsen acquired Woodrum's stock through the contract of May 12, 1965, in which they agreed to pay Woodrum "his one-third share of the profit" if control of the bank should be sold within two years, appellees in June selected Sydney Niblo to function as president and made a stock pool contract with him. This contract was similar to the pooling contract Cowan and Jacobsen first made with Woodrum around October, 1964. Under the terms of the agreement with Niblo an aggregate of 142,791 shares went into the pool. In the pooling contract with Woodrum the total was 142,608 shares. The shares attributable to Niblo under the pooling contract was 47,536 shares.

After the contract of August 28 with the group of purchasers and before the closing on September 3 with the group in Fort Worth, Cowan called on Niblo to buy or sell under terms of the pooling agreement. Cowan told Niblo that Cowan and Jacobsen "had a sale, and that they thought it was attractive and they wanted to do it." Niblo testified that he "was bound by the agreement" to sell "if they wanted me to," and he was not financially "in a position to buy their stock." Niblo stated, "* * * as I remember, I certainly expressed myself that I was disappointed that that was the way things were working and I certainly had no intention of getting into a situation like that just for a short interim period or as a speculative sort of thing. I regarded it as a more permanent situation."

Cowan and Jacobsen caused a complete stock power to be prepared, and Niblo executed the instrument before a notary public in Taylor County. The stock power, dated September 1, 1965, and directed to the Fort Worth National Bank, recited in pertinent part:

"This is to advise you that I have this date sold to Mr. Ray Cowan individually and to Mr. Ray Cowan and Mr. J. W. Munson, Trustees for Jake Jacobsen, all of the stock owned by me in the Bank of Commerce of Abilene, Taylor County, Texas, and which is in your possession. And you are hereby authorized to transfer said stock certificates in your possession to my grantees signing my name on said transfers.

\* . \* \* \* \* \*

"For the foregoing purposes, I here and now designate Fort Worth National Bank as my attorney-in-fact to transfer said stock certificates."

Cowan gave Niblo his personal check for the stock. When asked if he converted Cowan's check "to a cashier's check that same day," Niblo replied, "Immediately."

The transaction by which Cowan and Jacobsen acquired 47,536 shares from Niblo, bringing the stock pool subject to transfer to the group of purchasers to the sum of 162,191, was completed two days before the closing which took place at the Fort Worth National Bank on September 3. The stock transferred to the Abilene group was in excess of fifty-one percent of the outstanding shares of 230,000 and constituted sale of controlling interest in the Bank of Commerce.

Subsequent to acquiring control of the bank, the five purchasers found that the bank was in greater need of capital than they initially believed it required. When the State Banking Commissioner would not approve a capital contribution in the form of the real estate acquired from Cowan and Jacobsen, the five principals took title to the property in their individual names and secured a loan of $200,000 from the San Angelo Savings and Loan Association. The loan was evidenced by a promissory note upon which all five principals were jointly and severally liable. They then made a capital contribution of $200,000 to the Bank of Commerce.

At the time of hearing all of the principals, except Jackson who had settled with the other four men to relieve himself of further obligation on the San Angelo loan, were obligated on the note for $200,000. The record shows that all five principals involved in purchase of the controlling interest in the bank contributed jointly to the purchase of the stock by joint and several assumption of a loan at the Fort Worth National Bank in the sum of $1,301,450.40, and thereafter jointly contributed $200,000 *in cash to the bank while all of them* served on the bank's board of directors.

It does not appear to be disputed that *the five principals obligated themselves to* retain control of the bank, had specific understandings that no one of them would do anything to dilute their control, and would do nothing to prejudice the integrity of their joint agreement. Also, as noted, their contract with the Fort Worth National Bank obligated them to keep control of the bank within the group of five principals as long as the note to the Fort Worth bank was outstanding and not paid.

We find it conclusive in the record that the five principals would not have undertaken purchase of the block of stock from Cowan and Jacobsen if the purchase had not resulted in control of the bank being placed in the group and if the purchase *and subsequent management of the bank* had not been undertaken by them as a team working together. Corbin testified, "As an individual, I could not have bought the bank. As an individual, anyone of the five men who were involved in it could not, or would not have bought the bank. We were five joined together to make an acquisition."

After the five principals acquired the bank, for the years 1966 and 1967, joint partnership tax returns were filed reflecting equal interest of the five men in the bank real estate and buildings. During this period the property was still held for the group by Jackson as trustee. In accordance with their prior agreement, the five principals served in executive capacities in the bank and as a group maintained joint control of the bank and its affairs.

 It is settled that in construction of contracts the court will ascertain the real intention of the parties from the language found by examination of the entire agreement and will view the agreement as of the time it was made and not in the light of subsequent events. Ervay, Inc. v. Wood, 373 S.W.2d 380 (Tex.Civ.App. Dallas 1963, writ ref. n. r. e.); Burrus Mills, Inc. v. Hein, 378 S.W.2d 85 (Tex.Civ.App. Dallas 1964, writ dsmd.); Dedier v. Grossman, 454 S.W.2d 231 (Tex.Civ.App. Dallas 1970, writ ref. n. r. e.).

We think it clear that the main purpose of the parties in making the contract in October, 1964, under which they pooled their bank stock and agreed in effect not to sell it except in a block, was to concentrate *control of the bank in one group*— Woodrum, Cowan, and Jacobsen. If they all agree to sell their controlling interest in the bank, the price per share would be enhanced thereby, as opposed to piecemeal sales made to persons not seeking control. Under this arrangement, Woodrum contributed 73,682 shares and Cowan and Jacobsen had 68,926, to bring the pool to 142,608 shares, more than enough to effect control of the bank.

The later contract of May 12, 1965, upon which Woodrum brought this suit, as noted earlier, was "* * * made in consummation of, implementation to and in accordance with the agreement of October 1964 between the parties." By the last contract, a majority of the bank stock, constituting control, remained concentrated, this time in Cowan and Jacobsen, with Woodrum to have "his ⅓ share of the profit" if sold as a controlling interest within the next two years. We believe that a fair and reasonable reading of the contract is that part of the consideration for its making was that Woodrum in surrendering title to his stock retained an interest in any profit that

might be realized within two years from sale of "controlling interest * * * or sufficient * * * stock to amount to 51% of * * * authorized capital * * to any one person, firm or corporation * * *"

In using the term "to any one person, firm or corporation" the parties did not further the general intent of their contract to sell control of the bank, calculated to bring a better price per share than if sold piecemeal. The term could serve no purpose but to indicate that the parties would not sell the stock in separate lots under circumstances in which the purchasers were without motivation or desire to acquire controlling interest in the bank.

The appellees are at great pains to show that the term "firm" as used in the contract is not applicable to the five principals who bought the bank stock in one block and acquired, by their own expressed intent, a controlling interest in the bank. Appellees insist that the purchasers do not come within the meaning of the term because the group did not have the characteristics of a partnership. The cases relied upon and the argument of appellees in this connection deal with the elemental essentials of a general partnership.

■ If the combination achieved by the five principals in negotiating and acquiring control of the Abilene bank amounts to a joint venture, their mutual agreements to borrow money, buy the stock, and continue to retain controlling interest within their number were obligations binding upon the individual members of the venture. Under the facts which we have already stated, we conclude that this combination was a joint venture as a matter of law.

The Supreme Court has described a joint adventure as a limited or special partnership engaged in the joint prosecution of a particular transaction for mutual benefit or profit. Holcombe v. Lorino, 124 Tex. 446, 79 S.W.2d 307 (1935); Puryear Porter v. Puryear, 153 Tex. 82, 262 S.W.2d 933, 264

S.W.2d 689 (1953). "To constitute a joint adventure," the Supreme Court said in 1956, "there must be a community of interest and participation in the profits. It is in the nature of a partnership engaged in the joint prosecution of a particular transaction for mutual profit." Brown v. Cole, 155 Tex. 624, 291 S.W.2d 704 (1956). The Court there further stated, "The relationship being in the nature of a partnership, losses must be shared as well as profits." (291 S.W.2d 709, col. 2)

The five principals who bought control of the Abilene bank, with money they borrowed on a joint and several obligation, as between themselves bore the relation of joint adventurers under holdings of authorities found in 48 C.J.S. Joint Adventures § 2, pp. 813–814. There it is said that particular transactions constituting joint adventures include agreements "* * * that one or more shall contribute money and the other or others special knowledge, experience, or judgment, as in the purchase and development of lands; * * * the buying and selling of corporate stock * * and other transactions," including purchase and management of vessels, nurseries, gas companies, theaters, ice plants, and radio stations. To these enumerations it is equally logical to add the purchase, control, management, and operation of a bank as a transaction constituting a joint adventure.

■ Although the courts of this State do not treat a joint venture as identical with a partnership, " * * * yet it is universally held that such relation is so similar in its nature to a partnership and in the contractual relation created thereby that the rights as to the members are governed by substantially the same rules that govern partnerships." Thompson v. Duncan, 44 S.W.2d 904 (Tex.Com.App.1932) The joint adventure has been recognized as "* * * a species of partnership, and a concept of comparatively modern origin. Generally it is a partnership of a limited nature by two or more persons to jointly prosecute a particular transaction for mu-

tual benefit or profit. * * * The joint adventurer relation is subject to dissolution and termination upon the same basis as a conventional partnership." Booth v. Wilson, 339 S.W.2d 388 (Tex.Civ.App. Texarkana 1960, writ ref. n. r. e.). A joint adventure has been described as a partnership for a single transaction or venture. Harris v. Cleveland, 294 S.W.2d 235 (Tex.Civ.App. Galveston 1956, writ dsmd.). There is no distinction to be drawn between the duties owing by partners and those owing by joint adventurers. Johnson v. Peckham, 132 Tex. 148, 120 S.W.2d 786 (1938).

The rule followed in Texas and in most other jurisdictions is stated in American Jurisprudence:

"The relations of the parties to a joint venture and the nature of their association are so similar and closely kin to a partnership that it is ordinarily held that their rights, duties and liabilities are to be tested by rules which are closely analogous to and substantially the same, if not exactly the same, as those which govern partnerships." 46 Am.Jur.2d, Joint Ventures, sec. 4, pp. 24–25.

Appellees in negotiating and making a sale of the block of stock which gave the buyers control of the bank dealt with the purchasers as a group and had no transactions with them as separate individuals. Both the sellers and the buyers knew that the sale would place control of the bank in the buying group. Both also recognized that such a sale justified a higher price per share than if the stock were sold in lesser lots and to separate buyers instead of to a group acting jointly. The record shows that the stock was sold at a price yielding a profit to the sellers.

The contract between Woodrum and the appellees contemplated just such a sale. The contracting parties intended that a control block of stock was the quantity of stock that would bring the best price and that sale of such control would necessarily be made in a single transaction to one person, one firm, or one corporation, or to one legal entity capable under the law of taking and holding that controlling interest.

The term "one person, firm or corporation," as a designation of the party to whom the sale would be made, was incidental and subordinate to the general intent of the contract to sell control of the bank in a single transaction, in order to produce a profit. for the three contracting parties. A similar conclusion was reached, in construing this term, by a California court in Berylwood Investment Company v. Graham, 43 Cal.App.2d 659, 111 P.2d 467.

Cowan and Jacobsen satisfied the purposes and intent of the contract of May 12, 1965, when they sold 162,191 shares of stock to the group of five principals from Abilene. The sale placed controlling interest, in excess of fifty-one percent of the stock, in one entity, a group of men seeking such control and obligated by their mutual agreements, and by their contract with the Fort Worth National Bank, to hold control of the bank intact for a period of time appearing under the facts to be substantial in duration. Such a sale, by which control passed in one transaction from one group to another, was calculated to bring a better price per share of stock and to produce the very profit Cowan and Jacobsen contracted to share with Woodrum by paying to him "his ⅓ share of the profit."

Appellees, as defendants below, moved for summary judgment "on the ground that there is no genuine issue as to any material fact and that defendants are entitled to. judgment as a matter of law." The trial court, being of the opinion that the motion should be sustained, rendered judgment sustaining the motion and that plaintiff recover nothing from defendants.

In rendering judgment for defendants, the question was whether the summary judgment proof established as a matter of law that there was no genuine issue of fact as to one or more of the essential elements of the plaintiff's cause of

action. Gibbs v. General Motors Corporation, 450 S.W.2d 827 (Tex.Sup.1970). All doubts as to existence of a genuine issue as to a material fact will be resolved against the party moving for summary judgment, and the burden of such proof is upon the movant. It is not the purpose of Rule 166–A, Texas Rules Civ.Proc., governing summary judgments, to deprive a litigant of his right to a full hearing on the merits of any real issue of fact. Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929 (1952). Appellees failed under the summary judgment proof to establish as a matter of law that there was no, genuine issue of fact as to one or more of the essential elements of plaintiff's cause of action.

We hold that the purchasers of the stock were joint venturers, and that the sale to them was tantamount to a sale to a firm within the meaning and intent of the contract. The judgment of the trial court sustaining defendants' motion for summary judgment, and rendering judgment that plaintiff take nothing is reversed; and the cause is remanded to the trial court for determination of the issue of damages and rendition of judgment consistent with this opinion.

Reversed and remanded.